2004 OK CR 2

**James Chandler RYDER, Appellant**

v.

**STATE of Oklahoma, Appellee.**

**No. D–2000–886.**

Court of Criminal Appeals of Oklahoma.

Jan. 14, 2004.

Craig Corgan, Wayna Tyner, Sapulpa, OK, counsel for appellant at trial.

Gloyd McCoy, Oklahoma City, OK, counsel for appellant at the Retrospective Competency Hearing at trial and appeal.

Kayln Cherie Free, District Attorney, Richard Hull, Assistant District Attorney, McAlester, OK, counsel for the State at trial.

Chris Wilson, District Attorney, McAlester, OK, counsel for the State at the Retrospective Competency Hearing at trial.

W.A. Drew Edmondson, Attorney General of Oklahoma, Nancy E. Connally, Brant M. Elmore, Assistant Attorneys General, Oklahoma City, OK, counsel for the State on appeal.

## OPINION

LUMPKIN, Judge.

¶ 1 Appellant James Chandler Ryder was tried by jury and convicted of two counts of First Degree Murder (Count I) (21 O.S.1991, § 701.7), Case No. CF–99–147, in the District Court of Pittsburg County. In Count I, the jury recommended a sentence of life imprisonment without parole. In Count II, the jury found the existence of two aggravating circumstances and recommended the punishment of death. The trial court sentenced accordingly. From this judgment and sentence Appellant has perfected this appeal.[1]

¶ 2 During the latter part of 1998, Appellant was hired by Sam and Daisy Hallum to take care of their home and horses while they were out of town. Appellant lived at the Hallum's residence for approximately 4—5 months, rent-free; in exchange for work he did around the place. During this time, Appellant told friends he was planning to go to the Yukon. Appellant stored his supplies for that trip at the Hallum's residence. These supplies included a trailer, tools, and survival and camping supplies. Prior to April 2, 1999, Appellant left Oklahoma. Upon his return to the state, Appellant sought to get his things from the Hallums. On April 2, 1999, Pittsburg County Sheriff's Deputy Arnold was dispatched to meet Appellant at Highway 9A and McAnally Road to do a "standby" at the Hallum residence. Appellant introduced himself as Mitch Ryder and told Deputy Arnold he had some personal belongings he needed to get from the Hallums.

¶ 3 Upon arrival at the Hallum residence, Deputy Arnold saw Sam Hallum by the gate. Arnold informed Hallum that he and Appellant were there to pick up some personal property that belonged to Appellant. Sam Hallum said he didn't know anything about it, that it was between his mother and Appellant. Deputy Arnold and Appellant proceed-

1. Appellant's Petition in Error was filed in this Court on December 8, 2000. Appellant's brief was filed July 24, 2001. The State's brief was filed November 21, 2001. Appellant's reply brief was filed December 11, 2001. The case was submitted to the Court January 8, 2002. Oral argument was held March 26, 2002. The case was subsequently remanded to the District Court

of Pittsburg County to conduct a feasibility hearing to determine the ability to hold a retrospective competency hearing and, if feasible, hold a retrospective competency hearing. The feasibility hearing was held on June 28, 2002. A jury trial on Appellant's competency at the time of trial was held March 13, 2003.

ed to the house to talk to Daisy Hallum. When Arnold knocked on the door, Daisy answered. She greeted Arnold pleasantly but slammed the door in Appellant's face. Daisy Hallum told Deputy Arnold· of her dislike for Appellant and said none of his property was there. She said the property was in storage and she would have it there the next day. Deputy Arnold and Appellant agreed to meet at the same time the next day to retrieve the property.

¶4 The following day, April 3, 1999, Deputy Arnold and Appellant returned to the Hallum residence. Daisy Hallum said she did not have Appellant's property at her home. She said it was in a storage building in Eufaula. She gave Arnold the key to the storage building and told him to give it to Appellant. Deputy Arnold gave the key to Appellant. Arnold offered to get a deputy in Eufaula to go with Appellant, but Appellant refused. Arnold told Appellant that if his property was not there, to contact him and they would go out and talk to Daisy again. Arnold did not see or hear from Appellant again.

¶5 At the storage building, Appellant found only two empty boxes. He returned to Cindy McCord's residence where he had been staying. He retrieved a shotgun and pistol from the garage. McCord did not see Appellant again until the next morning, April 4, when Appellant returned to her home. That afternoon, Appellant packed his personal belongings in his car and told McCord he was going to Atlanta.

¶6 On Monday, April 5, Sam and Daisy Hallum advised Deputy Arnold that someone had kicked in their front door. They said personal belongings were strewn all over the house but they did not find anything missing. When asked if they had any suspicions about the perpetrator, Sam said he thought it was "Mitch" (Appellant).

¶7 On Thursday, April 8, Cindy McCord saw Appellant in Eufaula. She was surprised to see him, believing he had gone to Atlanta. Appellant told her he had been at a motel for a few days because he had some things to think about and "what he could do." Appellant was dressed in camouflage and black military style boots. Appellant asked McCord if he could put a few of his belongings back in her garage. McCord agreed, and asked Appellant what he was up to. Appellant told her the less she knew the better.

¶8 When McCord returned home later that night she saw Appellant's car in her driveway. She also noticed a pile burning near the garage. Inside her home, she found Appellant sitting in a recliner, leaning forward with one elbow propped up and his hand in the air wrapped in a towel. On the floor next to him was a half empty bottle of whiskey. When she asked what had happened, Appellant said he had shot his finger while turkey hunting. Appellant asked McCord to cut his finger off. She refused, telling him he needed to go to the hospital. Appellant said he wasn't going to any hospital, that they would ask too many questions. Appellant repeatedly told McCord that if anyone asked about him, to say that she hadn't seen him since Sunday. McCord helped clean Appellant's injured finger and got him to bed. She had told him he needed to go back to Atlanta like he had said he was going to do. Once Appellant was in bed, she packed his belongings in his car. The next day she remembered she had not seen his guns anywhere. When she asked Appellant about the guns, he merely replied "what guns?" McCord also looked through the pile that had burned and found a piece of camouflage cloth. When she asked Appellant why he had burned his shirt, he said it had gotten too much blood on it. The morning of April 9, McCord left for work and told Appellant that if he were still at her home when she returned that evening, they would talk. McCord did not see Appellant again.

¶9 That same morning, McCord received a phone call from a friend who told her that Sam Hallum had been found dead that morning. McCord had an instant "gut feeling" that Appellant was involved. She called the Oklahoma State Bureau of Investigation (OSBI), but by the time the agents arrived at her home, Appellant was gone. He was later located in Georgia.

¶10 Shortly after 9:00 a.m. on April 9, Michael Newman, a neighbor of the Hallums,

decided to go to the Hallum's residence to retrieve a welding machine. Upon pulling into the driveway, he noticed Sam Hallum laying face down in the front yard. Mr. Newman approached Sam and reached down to shake him awake. However, he noticed Sam was stiff and had blood dripping from him. When he realized Sam was dead, Mr. Newman immediately went to his home and called 911.

¶ 11 Officers from the Pittsburg County Sheriff's Office and the OSBI soon arrived. In addition to finding Sam Hallum dead in the front yard, they found blood and drag marks on the front porch and around the side of the house. Approximately 100 yards from the house, Daisy Hallum was found laying face down in a small depression. She was partially wrapped in a shower curtain.

¶ 12 The State's investigators and forensic experts testified that based upon the evidence at the crime scene, Daisy Hallum had been beaten in the living room of the house. She was then wrapped in a shower curtain and drug out of the house. The 70 year old woman had numerous lacerations and contusions on her head and face. Her nose and left cheekbone were broken and she had a skull fracture. Her hands were bruised and her fingers fractured and broken, with some fingers almost torn off. The experts called these types of wounds defensive wounds and said they indicated the victim had put her hands up to shield her face. Her cause of death was attributed to blunt force trauma to the head.

¶ 13 The experts testified that 38 year old Sam Hallum suffered multiple gunshot wounds. At least 12 large shotgun pellets were retrieved from his body. The gunshots penetrated his heart, lungs, stomach, liver, pancreas, spleen and left adrenal gland. The gunshot wounds indicated Sam was shot as he faced the house and was in the process of walking when he was struck. His cause of death was attributed to the gunshot wounds to the chest and abdomen.

¶ 14 The State charged Appellant with the first degree murders of both Sam and Daisy Hallum. Bills of Particular were filed in each case alleging the aggravating circumstances of "great risk of death" and "con-

tinuing threat." Additionally, the aggravator of "especially heinous, atrocious or cruel" was alleged as to Daisy's murder. At the close of the second stage evidence, the trial court sustained the defense demurs as to the two aggravators alleged as to Sam Hallum's murder. The jury was given the sentencing options of life imprisonment and life imprisonment without parole. The jury recommended a sentence of life imprisonment without parole. The trial court also sustained the defense demur to the aggravator of "especially heinous, atrocious or cruel" as to Daisy's murder. The trial court denied the defense demur as to the "continuing threat" aggravator. The jury was instructed as to the aggravators of "great risk of death to more than one person" and "continuing threat." The jury found the existence of both aggravators and recommended the sentence of death.

¶ 15 Appellant raises eleven (11) propositions of error in his appeal. These propositions will be addressed in the order in which they arose at trial.

### PRE-TRIAL ISSUES

¶ 16 In his first assignment of error, Appellant contends the trial court denied him a fair trial by improperly participating in plea negotiations. Prior to the start of trial, the State offered to recommend that Appellant be sentenced to two life sentences, to be served concurrently, in exchange for a plea of guilty on both counts. Appellant rejected the offer. Appellant now asserts that when the trial judge learned of the plea offer, the judge interjected himself into the negotiations and urged Appellant to take the offer. Appellant argues that in so doing, the trial court violated fundamental precepts of justice and he is therefore entitled to a new trial before a different judge.

¶ 17 The record shows that in addressing preliminary matters prior to the start of trial, the trial court indicated it understood that a plea offer had been made the previous week. The court inquired of counsel as to whether a plea agreement had been negotiated. Both defense counsel and the prosecutor acknowledged the plea offer. De-

fense counsel noted for the record that the State had offered to drop the bill of particulars and recommend two life sentences, to run concurrently in exchange for pleas of guilty. Defense counsel stated he had conveyed the offer to Appellant and felt as though Appellant understood the offer. Defense counsel further stated he informed Appellant that "truth in sentencing" would not be a consideration because of the time the crime was alleged to have been committed, that he would be eligible for parole after approximately 15 years, and that there was no guarantee he would receive parole. Defense counsel informed the court he told Appellant the offer was a good offer and that he advised Appellant to accept the offer. Defense counsel further informed the court that Appellant did not wish to avail himself of the State's offer and wanted to exercise his right to a jury trial.

¶ 18 The trial court then asked defense counsel if he had any objection to the court making observations about the offer and placing Appellant's refusal of the offer on the record. Defense counsel had no objections. The following then occurred:

THE COURT: Mr. Ryder, I agree with your attorney. I don't think truth at sentencing would effect your plea. For the record, if you decided to take the offer, if this is a question in your mind, sir, I would follow that recommendation. Secondly, I do believe that based on the evidence and you have been here through all the hearings. Based on what I understand the State intends to produce. I think that in my opinion for what it's worth, if anything it is a fair offer.

I also think your attorneys have done a very good job for you up to this point, and I am sure they will continue to do that. But I do believe that is a fair offer.

MR. RYDER: Well, if I was going to be free and if I am found guilty and y'all kill me I will be free anyway. Let's see what happens.

THE COURT: All right. Any other matter we need to take up.

**2.** Rule 11(e)(1) of the Federal Rules of Criminal Procedure provides in pertinent part:

¶ 19 Appellant cites no Oklahoma cases supporting his argument that the judge's inquiry into the plea negotiations was improper. Appellant does cite to several federal circuit court cases. In particular, Appellant relies on *United States v. Daigle,* 63 F.3d 346 (5th Cir.1995). In *Daigle,* the trial judge conducted an off the record meeting regarding the plea offer. During this discussion, the trial judge informed the defendant he followed the government's sentencing recommendation 90% of the time. The defendant subsequently entered a guilty plea in open court. On appeal, the Fifth Circuit reversed the conviction pursuant to Rule 11(e)(1) of the Federal Rules of Criminal Procedure, which prohibits judicial participation in plea negotiations.[2]

¶ 20 In contrast to *Daigle,* Appellant did not accept the plea offer made by the State. Appellant exercised his right to a jury trial and was convicted by a jury. Any comments made by the trial court concerning the quality of the offer were apparently ignored and certainly rejected by Appellant. Therefore, as Appellant did not accept the plea agreement, he has failed to show any prejudice occurred as a result of the trial court's inquiry.

¶ 21 Further, *Daigle* and other federal cases cited by Appellant rely on Rule 11(e)(1) of the Federal Rules of Criminal Procedure, which prohibits judicial participation in plea negotiations. Oklahoma has no such provision.

¶ 22 A review of the transcript shows the trial court did not actively participate in the plea negotiation process as alleged by Appellant. In seeking to have the offer and Appellant's rejection placed on the record, the court merely advised Appellant that the offer was a good one and that he should consider the advice of counsel and accept the offer. As Appellant did not accept the offer, and as he has not shown the trial court's inquiry was improper, no error or prejudice occurred.

¶ 23 In support of his claim that the trial court improperly injected itself into the plea negotiations, Appellant directs us to the fol-

The court shall not participate in any discussions between the parties concerning any such plea agreement.

lowing comment made by the trial judge during the second stage of trial:

I don't think its necessary to proceed with the competency hearing. Mr. Ryder has a right to proceed without mitigating evidence. He understands mitigating evidence. He understands the importance of mitigating evidence. Mr. Ryder would prefer to have a life sentence with the possibility of parole and getting out of prison or the death sentence. He does not wish to be sentenced to life without parole and in all honesty, I can't say that I blame him.

¶ 24 The record shows this comment was made during a hearing regarding Appellant's refusal to present mitigating evidence. *See Wallace v. State,* 893 P.2d 504 (Okl.Cr.), *cert. denied,* 516 U.S. 888, 116 S.Ct. 232, 133 L.Ed.2d 160 (1995). The comment merely summarizes Appellant's intentions during the second stage and does not concern the plea negotiation process. The personal comment by the trial judge does not indicate any improper participation by the trial court in the plea negotiation process. Appellant has failed to show any error in the court's comment.

¶ 25 Accordingly, Appellant has failed to establish the trial court improperly interjected itself into the plea negotiation process. Appellant's request for a new trial is denied, and this assignment of error is denied.

### *JURY SELECTION*

¶ 26 In his second assignment of error, Appellant contends he was denied his right to due process during *voir dire* proceedings when he was not allowed to be present at side bar conferences.

¶ 27 Appellant's motion for individual *voir dire* was considered in a pre-trial motion hearing. In denying the motion, the trial judge stated that it was not his policy to conduct individual *voir dire.* He stated that if a juror had any particular concerns they did not want to mention in front of the entire panel, they only had to raise their hand and they would be brought down front out of the hearing of the other potential jurors. The judge said he had not had a problem with this procedure in the past. Defense counsel

then asked if Appellant would be present at the bench also. The trial judge said he usually did not allow defendants to approach the bench. After hearing argument by defense counsel, the trial judge ruled that he would not allow the defendant to be present at the bench when he individually addressed a juror. The judge stated that counsel would be present, but he felt it put "undue pressure on that juror to have the defendant standing there in their face."

¶ 28 During *voir dire,* defense counsel stated he wanted on the record his continuing objection to bench conferences without the presence of Appellant. The trial judge once again overruled Appellant's objection, stating he felt it would be potentially intimidating for a juror to come up here and answer questions honestly when your client is standing here, looking at them, staring them in the face.

¶ 29 In *Perry v. State,* 893 P.2d 521, 528 (Okl.Cr.1995) this Court relied upon *United States v. Gagnon,* 470 U.S. 522, 526, 105 S.Ct. 1482, 1484, 84 L.Ed.2d 486 (1985) and *Snyder v. Massachusetts,* 291 U.S. 97, 105–106, 54 S.Ct. 330, 332, 333, 78 L.Ed. 674 (1934) stating:

A defendant has a due process right to be present during trial proceedings " 'whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge. [T]he presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, *and to that extent only.'* " The defendant's presence is not required where such "presence would be useless, or the benefit but a shadow."

A defendant also has a state statutory right to be present during certain communications with jurors. For instance, a trial court should not conduct communications with the jury outside the presence of counsel and the defendant during deliberations; nor should anyone communicate with the jury regarding the merits of the case prior to submission of the case to the jury.

893 P.2d at 528. *See also Gregg v. State,* 844 P.2d 867, 876–77 (Okl.Cr.1992).

¶ 30 Here, Appellant's presence at side bar conferences with potential jurors did not have a reasonably substantial relation to his opportunity to defend himself. Appellant could not have contributed anything at the side bar conferences that he could not have contributed from his seat at counsel table. With defense counsel present at the side bar conferences, counsel and Appellant could easily communicate concerning any pertinent information raised by a potential juror.

¶ 31 The only specific instance of a side bar conference in which Appellant claims his right of due process was infringed involved the excusal of a juror previously dismissed by another judge. The record reflects that after calling the initial twelve potential jurors to the jury box, one of the potential jurors informed the trial judge that Judge Taylor had excused him to attend his daughter's softball tournament. The potential juror said he had talked to Judge Taylor in his chambers, he had excused him, and told him to tell Judge Bartheld. Upon hearing this, Judge Bartheld dismissed the potential juror. Defense counsel objected arguing that the potential juror was one of two minorities he saw on the panel, and for Judge Taylor to dismiss the juror, in the absence of defense counsel and the defendant, and without the defense having an opportunity to make an inquiry, was improper. Judge Bartheld overruled the objection stating for the record that the excused juror appeared to be Native American. The trial judge then stated "I would venture to say since I have lived in Pittsburg County a number of these jurors have native american blood in them but probably physically don't look like it as much as Mr. Pope. But I'm sure a lot of them are native American." Further, he stated that the potential juror should not have come over to the jury after he had been excused by Judge Taylor. The mere fact that he did come with the rest of the potential jurors to the courtroom did not make his excusal improper.

¶ 32 Appellant has failed to show any error or resulting prejudice from the trial court's excusal of the potential juror based upon Judge Taylor's dismissal of the juror. *See Bland v. State,* 4 P.3d 702, 727 (Okl.Cr.2000), *cert. denied,* 531 U.S. 1099, 121 S.Ct. 832, 148 L.Ed.2d 714 (2001) (Appellant must show not only that error occurred but that the resulting prejudice from the error was such that reversal is warranted); *Bernay v. State,* 989 P.2d 998, 1007 (Okl.Cr.1999), *cert. denied,* 531 U.S. 834, 121 S.Ct. 92, 148 L.Ed.2d 52 (2000) (an appellant must support his allegations of error by both argument and citation of authority). Appellant has not shown that the excusal of the potential juror based upon Judge Taylor's ruling prevented him from having a fair and impartial jury or that it forced him to accept as jurors individuals he would not have otherwise wanted on the jury.

¶ 33 Appellant's reliance on *Francis v. State,* 413 So.2d 1175 (Fla.1982) is misplaced. In *Francis,* the entire jury selection process occurred outside of the presence of the defendant. In the present case, Appellant was able to participate in the jury selection process. Appellant was present and allowed to fully participate in the preemptory challenges. The trial court even noted for the record that peremptory challenges were being conducted in open court so Appellant could hear the challenges.

¶ 34 Appellant has failed to show any due process violation by his exclusion from the side bar conferences with potential jurors during *voir dire.* A fair and just jury selection was not thwarted by Appellant's absence from the side bar conferences. Accordingly, this assignment of error is denied.

## SECOND STAGE ISSUES

¶ 35 In his third assignment of error, Appellant contends the trial court erred in failing to grant his request for a competency evaluation at the beginning of the second stage of trial. Appellant argues this error requires the vacating of his sentences and remand to the district court for a new sentencing hearing.

¶ 36 After the return of the first stage guilty verdicts and prior to the start of second stage, the defense filed an application for determination of competency pursuant to 22 O.S.2001, § 1175.2A. Counsel informed the court that an attached psychological evaluation showed Appellant was not competent to

proceed. Counsel argued the contents of the report and information from Appellant's mother showed Appellant was suffering from depression and had not received any treatment. Further, counsel stated his concerns regarding Appellant's failure to assist counsel in any type of second stage preparation and his refusal to allow any type of mitigating evidence to be presented. Counsel asked that all criminal proceedings be suspended until it could be determined whether Appellant was competent to proceed.

¶ 37 In objecting to defense counsel's motion, the prosecutor questioned whether the application for competency determination was appropriate at the beginning of second stage and after judgments of guilt had been entered. After much discussion, the trial court noted the defense had been aware of the psychological evaluation since April 25, 2000, approximately one week before trial, and had not raised any allegations concerning Appellant's competency until the second stage proceedings. Defense counsel admitted that he had the psychological evaluation since before trial, but argued, "we feel the issue of competency only goes to the second stage issues." Defense counsel further stated:

> If I had had any questions as to Mr. Ryder's competency as to first stage, then we would have been before you. It's only as we tried to prepare for the second stage where he's told us that he's not going to present anything. He's not going to allow us to present anything that we felt it necessary in conjunction with the evaluation we had done to present this to the Court.

¶ 38 The trial court denied Appellant's request for a stay of proceedings and inquired of Appellant as to his reasons for refusing the presentation of mitigating evidence under the guidelines set forth in *Wallace v. State,* 893 P.2d at 512–13. The court found Appellant understood the importance of mitigating evidence, the effect of failing to present mitigating evidence, his rights during the trial, possible sentences, and his appellate rights. The court stated that the fact Appellant did not want to present mitigating evidence did not make him incompetent. The court noted that Appellant did not agree with counsel's

application for determination of competency and that Appellant had assisted counsel up to that point at trial.

¶ 39 The trial court then took testimony from Appellant's mother on the "limited issue of his competency." Mrs. Ryder testified Appellant was often depressed living at home, but he refused to seek professional assistance. She thought he needed help, but Appellant told her he didn't. She said Appellant told her his life "was no good" and that "he had no self-worth." On cross-examination, Mrs. Ryder testified Appellant had had no prior mental health problems or treatment for any mental illness. She said she did not seek to commit him in 1999 when she felt he needed help. She further stated that she and other family members had pleaded with Appellant to let them testify in his behalf. She said Appellant told her he did not want them to testify, stating "[h]e would rather die rather than spend the rest of his life in jail." After questioning Appellant one more time concerning his understanding of his rights and the proceedings, the trial court denied the application for determination of competency.

¶ 40 After hearing oral argument in this case, this Court remanded the case to the District Court of Pittsburg County to determine whether it was feasible to conduct a retrospective hearing on Appellant's competency at the time of trial pursuant to 22 O.S.2001, § 1175.1 *et.seq.* Our order stated that if the trial court found a retrospective hearing could be held, such a hearing was to be held to determine whether or not a doubt as to Appellant's competency to stand trial in 2000 existed. If a doubt as to Appellant's competency to stand trial was established, a post-examination competency hearing was to be held before either a judge or a jury. The findings and record from the hearing were to be forwarded to this Court and the parties were given the opportunity to file a supplemental brief addressing only issues relevant to the evidentiary hearing.

¶ 41 Pursuant to this Court's order, a feasibility hearing was held on June 28, 2002, and it was determined that a retrospective competency hearing on Appellant's competency at the time of his original trial could be held.

Appellant demanded a jury trial. At the jury trial held on March 13, 2003, Appellant presented the testimony of one witness, Dr. Dean P. Montgomery, PhD., a licensed psychologist. Dr. Montgomery testified he interviewed Appellant in 2000 while Appellant was incarcerated in the county jail prior to trial. Dr. Montgomery stated the interview took place at the sheriff's office and lasted for approximately four to five hours. Dr. Montgomery testified that during that time period he conducted a clinical interview and gave Appellant several different psychological tests. Dr. Montgomery stated that his conclusions in 2000 were that Appellant's "competence was certainly questionable." Dr. Montgomery testified his conclusion was based upon Appellant's lack of cooperation with counsel in refusing to identify a witness that might have been helpful to his case, refusing any plea agreements, and refusing to allow the participation of any family members in presenting mitigating evidence. Dr. Montgomery testified that Appellant demonstrated a "schizoid personality disorder" which is characterized by extreme disinterest in relationships with other people.

¶ 42 Dr. Montgomery also testified that since Appellant's trial, he had read the trial transcripts and in 2002 interviewed Appellant again. He said the additional information confirmed his conclusion that Appellant suffered from a severe delusional disorder. Dr. Montgomery stated that Appellant's grandiose delusions manifested themselves in a preoccupation with the Fourth Commandment to keep the Sabbath holy. On cross-examination, Dr. Montgomery made it clear that his opinion was based on Appellant's lack of cooperation with counsel and not any unusual religious beliefs Appellant may have.

¶ 43 The State presented three witnesses. Charlie Rogers was a field deputy for the Pittsburg County Sheriff's Department in 2000. He testified he transported Appellant from the county jail to the courthouse each day for trial. During that time period he remained with Appellant the entire day, including sitting in the courtroom during trial. Mr. Rogers testified he never observed any bizarre behavior from Appellant. He described Appellant's conduct at trial as "real tentative, kind of was listening, ... Acted like he was well-educated and watched what was going on." Mr. Rogers said he never discussed the facts of the case with Appellant, but Appellant's answers to questions concerning current events, the weather, or sports were responsive and coherent.

¶ 44 The Honorable Thomas Bartheld, the trial judge in Appellant's case, also testified. He testified the State had made an offer to Appellant to recommend two concurrent life sentences in exchange for a guilty plea. When Appellant rejected the offer, the trial judge questioned Appellant under oath about his decision. Judge Bartheld testified that at no time during pre-trial and first stage proceedings did Appellant indicate he might not understand what was happening. He said that during trial, counsel would often consult with Appellant. Judge Bartheld said there was nothing in Appellant's conduct during the entire trial that gave any indication that he was not competent to stand trial. He said if there had been any indication Appellant was not competent, he would have stayed the proceedings until the issue could be resolved.

¶ 45 Judge Bartheld testified the issue of Appellant's competency was not raised until the second stage of trial. He stated that when the issue was brought to his attention he questioned Appellant extensively and allowed defense counsel to question Appellant. Judge Bartheld testified that during defense counsel's questioning it became clear there was a dispute between Appellant and counsel concerning Appellant's desire not to present mitigating evidence and his decision to reject the State's offer of two concurrent life sentences. Judge Bartheld testified he questioned Appellant for over an hour and addressed all of his trial rights and appeal rights. He said that Appellant indicated he understood the three possible punishments, the purpose of the second stage of trial and of mitigating evidence. He said Appellant was very opposed to his family testifying, and did not want anyone "begging for his life." He said Appellant said more than once that he would rather die than spend the rest of his life in prison. However, this did not give him any reason to question Appellant's competence based upon Appellant's history.

He said Appellant had accumulated certain goods over a period of time so he could travel to the Yukon. Judge Bartheld said Appellant killed the victims in this case because he believed they had taken his possessions. Judge Bartheld testified he could understand Appellant would not want to spend the rest of his life in an 8 × 10 foot cell. Judge Bartheld stated that Appellant never gave any indication he did not understand the nature of the proceedings against him or that he was not competent to continue with trial.

¶ 46 The final witness for the State was Charlie Mackey, a special agent with the OSBI in 2000. Agent Mackey testified he traveled to Hall County Georgia where Appellant was incarcerated in order to get a sample of his blood. Agent Mackey said he read Appellant his *Miranda* rights and Appellant requested an attorney. Agent Mackey said when he asked Appellant if he would voluntarily give up his blood, Appellant refused and asked to see the court order. Agent Mackey testified that at no time did Appellant give the impression that he did not understand what was happening. Agent Mackey also testified that he attended the preliminary hearing, an evidentiary hearing, and the trial in this case. He said Appellant never exhibited any bizarre behavior and never gave any indication he did not understand the proceedings. Although he could not overhear what Appellant was saying to his counsel, Agent Mackey said Appellant wrote notes and conferred with counsel throughout trial.

¶ 47 At the close of testimony, the court instructed the jury, and counsel gave their closing arguments. The jury subsequently returned a verdict finding Appellant was not incompetent to undergo further criminal proceedings at the time of his original trial.

¶ 48 In his supplemental brief, Appellant has raised two allegations of error concerning his competency hearing. He challenges the sufficiency of the evidence finding him not incompetent and argues the trial court erred in failing to find him incompetent to stand trial on the issue of his competency at his original trial.

¶ 49 In his first allegation, Appellant argues that under the evidence presented at the competency hearing, no rational jury could have found him competent. Essentially, he argues that the State did not present an expert to rebut Dr. Montgomery's conclusions. Therefore, as Dr. Montgomery was the only expert to testify, and he testified that Appellant was not competent to stand trial in 2000; the jury must give precedence to his testimony. Appellant contends the jury should not be allowed to ignore the expert's testimony.

¶ 50 This Court has repeatedly held it is within the exclusive province of the jury to determine the weight and credibility of witnesses at trial. *Myers v. State*, 17 P.3d 1021, 1032 (Okl.Cr.2000), *cert. denied*, 534 U.S. 900, 122 S.Ct. 228, 151 L.Ed.2d 163 (2001), *Smith v. State*, 932 P.2d 521, 530 (Okl.Cr.1996), *cert. denied*, 521 U.S. 1124, 117 S.Ct. 2522, 138 L.Ed.2d 1023 (1997), *Curtis v. State*, 762 P.2d 981, 983 (Okl.Cr.1988). The jury may believe one witness while discrediting other witnesses. *McDonald v. State*, 674 P.2d 1154, 1155 (Okl.Cr.1984), *Renfro v. State*, 607 P.2d 703, 706 (Okl.Cr.1980). This Court has never required a jury to surrender its own opinions to that of an expert witness. In fact, the Oklahoma Uniform Jury Instructions—Criminal (OUJI–CR) 11–6 specifically informs the jury not to surrender its own judgment for that of an expert witness. The uniform instruction, which was given to the jury in this case, provides in pertinent part:

There has been introduced the testimony of witnesses who are represented to be skilled in certain areas. Such witnesses are known in law as expert witnesses. You may consider the testimony of these witnesses and give it such weight as you think it should have, but the value to be given their testimony is for you to determine. You are not required to surrender your own judgment to that of any person testifying as an expert or otherwise. The testimony of an expert, like that of any other witness, is to be given such value as you think it is entitled to receive.

¶ 51 Appellant has not cited any Oklahoma authority to support his proposition that the jury should not be allowed to disregard an expert's opinion. Instead, he relies on cases

from other jurisdictions, which state that a jury cannot disregard expert testimony when such pertains to medical issues beyond the scope of a layman. *See Morus v. Kapusta,* 339 Ill.App.3d 483, 274 Ill.Dec. 351, 791 N.E.2d 147 (2003). The determination of whether Appellant was legally competent to stand trial in 2000 was not an issue beyond the scope of a layperson.[3]

¶ 52 Further, in proceedings to determine whether a doubt has arisen sufficient to warrant a competency hearing, this Court has held that the trial judge, sitting as the trier of fact, is not bound to give precedence to the opinions of expert witnesses. *See Bryson v. State,* 876 P.2d 240, 249–250 (Okl.Cr.1994), *cert. denied,* 513 U.S. 1090, 115 S.Ct. 752, 130 L.Ed.2d 651, (1995). *See also Davis v. State,* 980 P.2d 1111, 1115 (Okl.Cr.1999).

¶ 53 Accordingly, we find the jury could properly base its verdict on the evidence presented by the State despite the fact the State did not present an expert witness. Therefore, we next turn to the evidence to determine if it supported the jury's verdict.

■ ¶ 54 The test at the hearing to determine competency is whether the accused has sufficient ability to consult with his lawyer and has a rational as well as actual understanding of the proceedings against him. *Bryson,* 876 P.2d at 249. The standard of review on appeal is whether there is any competent evidence reasonably supporting the trier of fact. *Id.*

■ ¶ 55 Dr. Montgomery saw Appellant once for approximately four to five hours. On the basis of psychological tests performed during that time, Dr. Montgomery concluded Appellant's competency was "in question" because of his lack of cooperation with counsel. On cross-examination, Dr. Montgomery admitted that his conclusion in 2002 that Appellant was not competent had changed since his original conclusion in 2000 that Appellant's

competency was "questionable". Dr. Montgomery agreed that someone with a mental disorder could be competent to stand trial. Dr. Montgomery testified that during his initial evaluation, Appellant understood the nature of the charges against him, his memory for both recent and remote events was in tact, he understood his attorney's role in the proceedings, and the three possible punishments he was facing. Dr. Montgomery also acknowledged that in his initial report he stated Appellant seemed to appreciate his situation, demonstrated an unimpaired understanding of basic legal situations, and felt that he was being treated fairly and represented well by his attorneys. Dr. Montgomery testified that in 2000 he was asked to conduct a psychological evaluation of Appellant, not a competency evaluation. He acknowledged that in his 2000 report his conclusion as to Appellant's lack of competence was based upon Appellant's failure to rationally assist counsel, and his adamant resistance to the involvement of his family on his behalf.

¶ 56 The State's three witnesses observed Appellant for approximately the length of the four to five day trial. The trial judge testified Appellant's rejection of the plea offer was rational and was a choice made often in his courtroom. Judge Bartheld also found Appellant's desire for either life in prison or the death penalty rational based upon Appellant's history of living outdoors and having the ability to move around freely.

¶ 57 The state's witnesses testified they did not observe any bizarre behavior from Appellant, and that he conversed with them in a rational manner. Judge Bartheld testified that Appellant did not act like he was incompetent but rather he acted mad at his attorneys for their insistence to involve his family in the trial against his wishes. Appellant had been seen taking notes at trial and

---

3. This is especially true in a case involving psychological and psychiatric testimony. So much of the opinion given by these expert witnesses is based on subjective opinion. These types of experts often cite to a diagnosis in the Diagnostic and Statistical Manual of Mental Disorders (1994) (DSM–IV) published by the American Psychiatric Association. Based upon the procedure utilized to enter a proposed malady into the

DSM–IV, there is some question as to whether some of the possible diagnoses listed in the DSM–IV could meet the admissibility requirements of *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 1174, 143 L.Ed.2d 238 (1999), *Taylor v. State,* 889 P.2d 319 (Okl.Cr.1995).

conferring with counsel. While none of the State's witnesses could testify as to the contents of those conversations, Judge Bartheld testified defense counsel frequently asked for a moment so as to confer with their client.

¶ 58 This Court has held that a defendant in a capital proceeding may refuse to present mitigation evidence. *Wallace v. State*, 893 P.2d 504, 510 (Okl.Cr.), *cert. denied*, 516 U.S. 888, 116 S.Ct. 232, 133 L.Ed.2d 160 (1995). Further, this Court has recognized that a seemingly unwise decision to reject a plea agreement does not constitute incompetence. *Boltz v. State*, 806 P.2d 1117, 1122 (Okl.Cr.1991); *cert. denied*, 502 U.S. 846, 112 S.Ct. 143, 116 L.Ed.2d 109 (1991). A defendant's deliberate choice to act hostile to counsel is not sufficient to warrant a finding of incompetence. *See Phillips v. State*, 989 P.2d 1017, 1027 (Okl.Cr. 1999), *cert. denied*, 531 U.S. 837, 121 S.Ct. 97, 148 L.Ed.2d 56 (2000). Counsel's inability to communicate with his client is not sufficient to warrant a finding of incompetence. *See Fox v. State*, 524 P.2d 60, 65 (Okl.Cr.1974). Competency to stand trial is not merely a medical issue. *Littlejohn v. State*, 989 P.2d 901, 907 (Okl.Cr.1998). "Testimony from lay persons who have observed the defendant's behavior and communicative abilities is proper, provided the observations are reasonably proximate in time to the competency trial." *Id. quoting Lambert v. State*, 888 P.2d 494, 502 (Okl.Cr.1994).

¶ 59 The evidence in this case shows Appellant understood the nature of the charges against him and had the ability to assist counsel in his defense at his trial in 2000. Any rational trier of fact could have found from the evidence presented that Appellant had not proven his incompetence by a preponderance of the evidence. This supplemental claim is denied.

¶ 60 In his second supplemental claim of error, Appellant contends the trial court erred in failing to hold a hearing to determine his contemporary competency prior to proceeding with the retrospective competency determination.[4] Appellant argues that under 22 O.S.2001, § 1175.1—1176, the retrospective competency hearing is a criminal proceeding which must be suspended pending determination of his contemporary competency.

¶ 61 Section 1175.1(3) of title 22 defines "criminal proceeding" for purposes of a competency determination as "every stage of a criminal prosecution after arrest and before judgment, including, but not limited to, interrogation, lineup, preliminary hearing, motion dockets, discovery, pretrial hearings and trial."

¶ 62 In *Van White v. State*, 990 P.2d 253, 262 (Okl.Cr.1999), this Court found a defendant's interest under the competency statutes was in being found competent to participate in criminal proceedings. Citing to section 1175.1(3), this Court found the competency statutes "require only a determination that Appellant was competent to participate in criminal proceedings before his conviction." *See also Bryan v. State*, 935 P.2d 338, 350 (Okl.Cr.), *cert. denied*, 522 U.S. 957, 118 S.Ct. 383, 139 L.Ed.2d 299 (1997). "A competency hearing is a special proceeding for the purpose of ensuring full compliance with due process requirements, but is not itself a criminal prosecution." *Rogers v. Lansdown*, 829 P.2d 687, 688 (Okl.Cr.1992)

4. The record reflects that on September 27, 2002, approximately 3 months after the Feasibility Hearing, the District Attorney for Pittsburg County filed a Notice and Application for Determination of Competency. At a September 30, 2002, hearing Dr. Dean Montgomery was called as a witness. Both the State and the defense agreed, following the witness's testimony, that Appellant should be evaluated for contemporary competency. Appellant was evaluated. Following that evaluation, the trial court set a jury trial for January 13, 2003, to determine Appellant's competency to stand trial in 2000. On January 13, 2003, the newly elected District Attorney for Pittsburg County filed a Motion to Dismiss and Brief in Support of the Motion to Dismiss the Application for Determination of Competency. After hearing argument from both counsel, the trial court granted the State's Motion to Dismiss finding the defendant was not entitled to a jury trial to determine if he was competent to stand trial in a retrospective competency proceeding. The State subsequently informed the trial judge that it intended to endorse him as a witness at the retrospective competency trial. The trial judge *sua sponte* recused from presiding over further matters in the case. The Honorable Gene Mowery, Associate District Judge for McIntosh County, was subsequently assigned to preside over the retrospective competency trial.

quoting *Miller v. State,* 751 P.2d 733, 736–38 (Okl.Cr.1988).

¶ 63 As the retrospective competency hearing in this case occurred after judgment and sentencing, it is not a criminal proceeding that must be suspended pending determination of contemporary competency. Therefore, the trial court's failure to make a finding of Appellant's contemporary competency at the time of the retrospective competency hearing was not error. This second supplemental proposition of error is denied.

## AGGRAVATING CIRCUMSTANCES

### A.

¶ 64 Appellant raises two challenges to the "continuing threat" aggravator. In his sixth assignment of error, he contends the aggravator violates double jeopardy under the principles of collateral estoppel. During the second stage, the trial court held the evidence was insufficient to prove the "continuing threat" aggravator as to the murder of Sam Hallum. Appellant contends the doctrine of collateral estoppel precluded the jury from considering the aggravator as to the murder of Daisy Hallum.

¶ 65 The record reflects that the defense demurred to the "continuing threat" aggravator as alleged in each count. In granting the demur as to the murder of Sam Hallum, the trial court stated:

> The demur as to Sam Hallum on continuing threat is granted. The law is not—each murder is separate. You can't roll Daisy's murder and Sam's murder for purpose of aggravator. Both sides are correct that there has to be a finding that a particular murder was brutal and callused. I don't think that there has ever been a holding that a single shotgun blast such as the one we have in Mr. Hallum's case is a callused and brutal killing. So as to that point that's sustained.

¶ 66 Initially, the State responds that the trial court erred in granting the demur, and that the evidence supported the aggravator. In his explanation for granting the demur, the trial judge seems to have confused the standard of review for the "continuing threat" aggravator with that of the "especially heinous, atrocious or cruel" aggravator. The "continuing threat" aggravator is aimed at the defendant's future conduct. To establish "continuing threat" the State must show a pattern of criminal conduct that will likely continue in the future. *Ochoa v. State,* 963 P.2d 583, 604 (Okl.Cr.1998), *cert. denied,* 526 U.S. 1023, 119 S.Ct. 1263, 143 L.Ed.2d 358 (1999). *See also Hain v. State,* 919 P.2d 1130, 1147 (Okl.Cr.), *cert. denied,* 519 U.S. 1031, 117 S.Ct. 588, 136 L.Ed.2d 517 (1996). On the other hand, the aggravator of "especially heinous, atrocious or cruel" is supported by evidence that the victim's death was preceded by torture or serious physical abuse. *Revilla v. State,* 877 P.2d 1143, 1155 (Okl.Cr.1994), *cert. denied,* 513 U.S. 1096, 115 S.Ct. 764, 130 L.Ed.2d 661 (1995). The trial court's reliance in this case on the "single gunshot blast" was not a proper consideration in reviewing the "continuing threat" aggravator. *See Cargle v. State,* 909 P.2d 806, 831 (Okl.Cr.1995), *cert. denied,* 519 U.S. 831, 117 S.Ct. 100, 136 L.Ed.2d 54 (1996).

¶ 67 Further, in determining whether evidence supported the "continuing threat" aggravator, the trial court failed to fully consider whether the nature of the crime in this case illustrated the calloused nature of the defendant. *Turrentine v. State,* 965 P.2d 955, 977 (Okl.Cr.), *cert. denied,* 525 U.S. 1057, 119 S.Ct. 624, 142 L.Ed.2d 562 (1998). The trial court should have considered that Appellant had brutally bludgeoned Daisy to death with a blunt object prior to waiting for Sam to return to the residence. As soon as Sam walked towards his home, Appellant ambushed him by shooting him in the chest. This evidence was sufficient to support the "continuing threat" aggravator.

¶ 68 In support of his collateral estoppel argument, Appellant relies on *Ashe v. Swenson,* 397 U.S. 436, 442, 90 S.Ct. 1189, 1193, 25 L.Ed.2d 469, 475 (1970) and a host of cases from other jurisdictions. However, none of these cases accurately address the issue before us. In *Romano v. State,* 847 P.2d 368 (Okl.Cr.1993), *aff'd, Romano v. Oklahoma,* 512 U.S. 1, 114 S.Ct. 2004, 129 L.Ed.2d 1

(1994) this Court addressed the issue of collateral estoppel as follows:

> In *Ashe v. Swenson,* 397 U.S. 436, 442, 90 S.Ct. 1189, 1193, 25 L.Ed.2d 469, 475 (1970), the Supreme Court stated that collateral estoppel "means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuits." The Court held that collateral estoppel was not only a requirement of due process, but was a part of the Fifth Amendment's guarantee against double jeopardy.
>
> The Double Jeopardy prohibition constitutionally guaranteed by the Fifth Amendment to the United States Constitution and Article 2, § 21, of the Oklahoma Constitution applies only to an individual's right not to be placed twice in jeopardy for the same offense. While the doctrine of collateral estoppel, adopted by the Court in *Ashe,* is much broader and applies to the adjudication by a trier of fact that the accused was not the person who committed the acts comprising the charged offense or that the accused had not committed an essential element of a separate and distinct offense. The foundational question which must be answered in determining the applicability of collateral estoppel is whether there has been a prior adjudication by a trier of fact that in effect acquits the accused of the specific charged offense or an essential element of a separate and distinct offense. *See Ellis v. State,* 834 P.2d 985 (Okl.Cr.1992); *White v. State,* 821 P.2d 378 (Okl.Cr.1991) (Lumpkin, J. concurring in results).

847 P.2d at 387–388.

¶ 69 The murders in this case were two separate offenses committed in different ways. The evidence supporting one was not necessarily the same as that supporting the other. Here, the trial court properly considered the murders to be separate and distinct. The judge found the circumstances surrounding the murder of Sam Hallum did not support a finding of Appellant's future dangerousness. The adjudication of this issue by the judge was not the same as adjudicating whether different evidence supported a finding of the existence of the aggravator in the murder of Daisy Hallum.

¶ 70 Appellant also relies on *Chaney v. State,* 612 P.2d 269 (Okl.Cr.1980), 450 U.S. 1025, 101 S.Ct. 1731, 68 L.Ed.2d 219 (1981) to support his argument. However, *Chaney* is not applicable to the present case. In *White v. State ex. rel Hopper,* 821 P.2d 378 (Okl.Cr. 1991) this Court summarized *Chaney* as follows:

> In *Chaney* the defendant was charged with two murders in separate indictments. He kidnapped the victims at the same time, he held them together, he killed each in relatively short succession. The defendant moved for joinder which the State opposed and the trial court denied. The prosecutor assured the trial court he would redact all evidence of the second murder during the trial of the first. In fact the prosecutor reneged on this promise and brought in evidence of the second murder at every possible opportunity beginning with opening statement. This court held the two murders should have been joined, and the State was therefore estopped from trying the second murder.
>
> In that case the two murders were so inextricably entwined that the story of one could not be told without exposing the other in detail. While this makes the evidence of the other murder admissible under the res gestae or necessary facts exception to other crimes evidence, it also runs the prosecution headlong into the collateral estoppel bar. In that case facts were such that where the jury determined the defendant guilty of one of them, it of necessity found the defendant guilty of both. The trial court erred by failing to grant the defendant's motion to consolidate, and the prosecutor lost its opportunity to prosecute the second murder by using its evidence in the trial of the first.

821 P.2d at 380.

¶ 71 The issue in *Chaney* was whether the defendant could be prosecuted for both murders. In the present case, there is no question that Appellant can be prosecuted for both murders. The issue here is not guilt or innocence, but punishment. The finding by

the trial judge that the evidence was insufficient to support the "continuing threat" aggravator as to the murder of Sam Hallum was not also a finding that the evidence was insufficient to support the aggravator as to Daisy Hallum's murder. Other cases relied on by Appellant, from Oklahoma and other jurisdictions address either re-trials or re-sentencing of defendants. That is not the situation in this case.

¶ 72 Here, the trial court properly considered the two murders separate and distinct offenses. While certain evidence presented by the State overlapped, the manner of killing was different in each instance and therefore formed the basis for the existence of different aggravating circumstances as to each murder. Under the evidence in this case, the doctrine of collateral estoppel was not violated by the trial court's ruling rejecting the aggravator as to one murder but not the other.

¶ 73 Appellant's final argument in his sixth allegation of error is a brief assertion that counsel was ineffective for failing to object to the imposition of the "continuing threat" aggravator on collateral estoppel/double jeopardy grounds. As counsel had no legal grounds to raise such an objection, we cannot find him ineffective for failing to do so. Accordingly, this assignment of error is denied.

### B.

■■■■ ¶ 74 Appellant challenges the sufficiency of the evidence to support the "continuing threat" aggravator in his seventh assignment of error. "When the sufficiency of the evidence of an aggravating circumstance is challenged on appeal, the proper test is whether there was any competent evidence to support the State's charge that the aggravating circumstance existed." *Romano,* 847 P.2d at 387. "In making this determination, this Court should view the evidence in the light most favorable to the State." *Id.*

¶ 75 In evaluating whether there is a probability that the defendant will commit acts of violence which will constitute a continuing threat to society, we have held that the murder for which the defendant was convicted can be considered as supporting evidence. *Abshier v. State,* 28 P.3d 579, 610 (Okl.Cr.

2001); *Turrentine,* 965 P.2d at 977–78; *Robison v. State,* 677 P.2d 1080, 1088 (Okl.Cr.), *cert denied,* 467 U.S. 1246, 104 S.Ct. 3524, 82 L.Ed.2d 831 (1984). These cases addressed the characteristic of callousness as reflected by the defendant's actions. In determining the callousness of the crime, the defendant's attitude is critical to the determination of whether he poses a continuing threat to society. *Hain,* 919 P.2d at 1147. "A defendant who does not appreciate the gravity of taking another's life is more likely to do so again." *Id. quoting Snow v. State,* 876 P.2d 291, 298 (Okl.Cr.1994), *cert. denied,* 513 U.S. 1179, 115 S.Ct. 1165, 130 L.Ed.2d 1120 (1995).

■■■■ ¶ 76 In the present case, the State presented no evidence of a prior criminal history. Therefore we look to the circumstances surrounding the murder of Daisy Hallum. The victim was a 70 year old woman who weighed only 123 pounds. She was first attacked in the living room of her home, possibly as she was lying down. Her glasses were found on the floor near the sofa. Blood was scattered throughout the residence indicating a struggle had occurred. She had 18 lacerations on her head caused by blunt force blows. Her cheekbones and nose were broken. She suffered a skull fracture. The injuries to her brain were so severe and massive her brain stem was almost torn in two. Many blows were inflicted while her head lay on the ground. There was also evidence of defensive wounds. Her fingers were broken and almost torn off. These injuries indicated the victim tried to defend herself by putting her hands up to cover her head and face. After beating the victim to death, Appellant dragged her body outside and left her in the grass. Appellant then waited for Sam Hallum. As Hallum walked towards his residence, Appellant shot him, repeatedly, with a shotgun. Appellant's brutal bludgeoning of 70 year old Daisy, and his lying in wait to kill Sam Hallum clearly shows the callous nature of the murder and that Appellant has a propensity to violence, which makes him a continuing threat to society. Accordingly, this assignment of error is denied.

## C.

¶ 77 In his eighth assignment of error, Appellant challenges the "great risk of death" aggravator arguing it was not support by sufficient evidence. This aggravating circumstance is proved by a defendant's acts which create a risk of death to another "in close proximity, in terms of time, location, and intent" to the killing. *Williams v. State,* 22 P.3d 702, 724 (Okl.Cr.2001) *cert. denied,* 534 U.S. 1092, 122 S.Ct. 836, 151 L.Ed.2d 716 (2002) *quoting Le v. State,* 947 P.2d 535, 549 (Okl.Cr.1997), *cert. denied,* 524 U.S. 930, 118 S.Ct. 2329, 141 L.Ed.2d 702 (1998). The gravamen of the circumstance is not the number of persons killed, but the callous creation of the risk to more than one person. *Id.* Appellant argues that the two murders in this case did not create a great risk of death to more than one person. He contends that during each murder, the perpetrator only created a risk of death to that particular victim.

¶ 78 The exact time between Daisy Hallum's death and Sam Hallum's death was not established in this case. What the State did establish was that Cindy McCord saw Appellant on April 4 carrying a long shotgun and a pistol tucked in his belt. She did not see him again until April 8 when he told her "the less you know the better." That evening, Appellant showed up at McCord's house with a finger "shot off." McCord had warned Appellant that Sam Hallum was dangerous and not someone to "reckon with". The State's evidence showed Appellant beat Sam's mother to death with the knowledge that Sam would be looking for him as a result. Appellant killed Daisy then waited at the Hallum residence for Sam to return home. He shot Sam as he walked towards the front door. The two murders in this case were in close proximity and were sufficient to prove Appellant created a great risk of death to more than one person.

### PROSECUTORIAL MISCONDUCT

¶ 79 In his ninth assignment of error, Appellant contends he was denied a fair sentencing proceeding when the prosecutor misstated the law with regard to the aggravating circumstances. Appellant directs us to the following comment.

> Ladies and Gentlemen, you have heard the evidence. You have seen the evidence in this courtroom and I believe that based upon what you have heard that you would be able to give a check mark that the defendant knowingly created a great risk of death to more than one person. As a result of that, you also have that there exists the possibility that the defendant would commit criminal acts of violence that would constitute a continuing threat.

Appellant contends this argument told the jury that if they found the "great risk of death" aggravator, then they automatically had to find the "continuing threat" aggravator. Initially, we note that no contemporaneous objection was raised; therefore we review only for plain error. *Simpson v. State,* 876 P.2d 690, 693 (Okl.Cr.1994).

¶ 80 Immediately after the above comment, the prosecutor stated:

> And when you look at the instructions, the instruction says that this aggravating circumstances does not establish unless proved beyond a reasonable doubt the defendant constitutes a threat to society and a probability that the threat will continue in the future. That nobody—that includes Daisy. And we know that as a result of that, we can reasonably conclude that he set out to kill Sam as well.
>
> I submit to you that under the portion of the verdict form with regard to Daisy Hallum, the State has met that. That you have the evidence in front of you how brutally beaten she was. I ask that you consider that in your deliberations and talk about it amongst yourselves.

¶ 81 When the prosecutor's comments are read in context, it becomes clear he was summarizing the evidence supporting the aggravating circumstances and stating that in his view, the evidence supported the jury finding the existence of the aggravators as alleged in Daisy's case. The prosecutor then referred the jury to their instructions and the burden of proof that had to be met by the State before the jury could find the existence of the "continuing threat" aggravator. While the prosecutor's phrase "as a result of that"

was probably not the best choice of terms, it clearly did not direct the jury that their finding of an aggravator was automatic.

¶ 82 In *Romano,* we stated:

We recognize, as did the United States Supreme Court in *United States v. Young,* 470 U.S. 1, 10, 105 S.Ct. 1038, 1043, 84 L.Ed.2d 1, 9 (1985), that "in the heat of argument, counsel do occasionally make remarks that are not justified by the testimony, and which are, or may be prejudicial to the accused." However, "... a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial." *Id.,* 470 U.S. at 11, 105 S.Ct. at 1044, 84 L.Ed.2d at 11. This Court has held that in order for the remarks of the prosecuting attorney to constitute reversible error they must be flagrant and of such a nature as to be prejudicial to the defendant. *Collins v. State,* 758 P.2d 340, 341 (Okl.Cr.1988); *Wimberli v. State,* 536 P.2d 945, 952 (Okl.Cr.1975). From a practical standpoint, every slight excess by the prosecutor does not require that a verdict be overturned and that a new trial be ordered. *Aiuppa v. United States,* 393 F.2d 597 (10th Cir.1968).

847 P.2d at 380.

¶ 83 In the present case, the challenged comment was an isolated remark. The jury was properly instructed on the law concerning the aggravating circumstances. No challenges have been raised to these instructions. Appellant has not rebutted the presumption that juries are presumed to follow their instructions. *Zafiro v. United States,* 506 U.S. 534, 540, 113 S.Ct. 933, 939, 122 L.Ed.2d 317(1993); *Turrentine,* 965 P.2d at 968. Appellant has failed to show that when the challenged comment is read in context of the entire closing argument, and considered in light of the instructions given to the jury, that he was denied his right to a fair sentencing proceeding. Accordingly, Appellant's claim that trial counsel was ineffective for failing to raise an objection to the challenged comments is rejected as Appellant

has failed to show the comment affected the fairness of his sentencing proceeding. Therefore, counsel cannot be found ineffective for failing to raise an objection. *Hooks v. State,* 19 P.3d 294, 318 (Okl.Cr.2001). This assignment of error is denied.

### INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS

#### A.

¶ 84 In his fourth assignment of error, Appellant contends he was denied the effective assistance of counsel by counsel's failure to request a competency hearing prior to trial. Appellant asserts that trial counsel had information prior to trial which cast doubt on the issue of his competency to be tried. He asserts that counsel's failure to alert the judge to this information rendered counsel's assistance ineffective and warrants a new trial.

¶ 85 The standard of review for claims of ineffective assistance of counsel is that set forth in *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). *Strickland* applies the presumption that trial counsel was competent to provide the guiding hand that the accused needed, and therefore the burden is on the accused to demonstrate both a deficient performance and resulting prejudice. *Id. See also Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). *Strickland* sets forth the two-part test which must be applied to determine whether a defendant has been denied effective assistance of counsel. First, the defendant must show that counsel's performance was deficient, and second, he must show the deficient performance prejudiced the defense. Unless the defendant makes both showings, "it cannot be said that the conviction ... resulted from a breakdown in the adversary process that renders the result unreliable." *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064. Appellant must demonstrate that counsel's representation was unreasonable under prevailing professional norms and that the challenged action could not be considered sound trial strategy. 466 U.S. at 688–89, 104 S.Ct. at 2065. The burden rests with Appellant to

show that there is a reasonable probability that, but for any unprofessional errors by counsel, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.,* 466 U.S. at 698, 104 S.Ct. at 2070, 80 L.Ed.2d at 700. This Court has stated the issue is whether counsel exercised the skill, judgment and diligence of a reasonably competent defense attorney in light of his overall performance. *Bryson v. State,* 876 P.2d 240, 264 (Okl.Cr. 1994), *cert. denied,* 513 U.S. 1090, 115 S.Ct. 752, 130 L.Ed.2d 651 (1995).

¶ 86 As discussed above, trial counsel did have the psychological evaluation, finding Appellant not competent to stand trial, prior to trial. However, counsel also had information gained from his interaction with Appellant that Appellant was able to assist in his defense and that he had a rational understanding of the legal proceedings against him. Appellant directs us to *United States v. Boigegrain,* 155 F.3d 1181 (10th Cir.1998) for the proposition that trial counsel should raise the issue of competency even if the client does not want him to do so. In *Boigegrain,* the defendant argued he received ineffective assistance of counsel due to counsel's raising the issue of competency against the defendant's wishes. In upholding the finding of the trial court that the defendant was not competent to stand trial, the Tenth Circuit stated: "[d]efense counsel should move for evaluation of the defendant's competence to stand trial whenever the defense counsel has a good faith doubt as to the defendant's competence." 155 F.3d at 1188.

¶ 87 In the present case, the record reflects counsel did not have a "good faith doubt" as to Appellant's competence to stand trial. In fact, counsel admitted as such when the application for competency determination was first raised at the beginning of second stage. Counsel admitted to having the psychological evaluation prior to trial, but stated he had no questions about Appellant's competency until Appellant refused to assist in the presentation of mitigating evidence in second stage. Counsel was not required to request a competency determination based solely upon the findings in the psychological

evaluation. In this case, Appellant was apparently lucid and rational and did not give counsel any reason to question his competence to stand trial. Appellant has failed to show a reasonable probability that, but for counsel's failure to request a competency determination before trial, the result of his trial would have been different. Accordingly, Appellant has failed to establish he received ineffective assistance of counsel. This assignment of error is denied.

### B.

¶ 88 Appellant contends in his fifth assignment of error that he was denied the effective assistance of counsel during the second stage of trial due to counsel's failure to present mitigating evidence. Appellant begins his argument with a quote from *Boigegrain,* "[r]equiring a lawyer to argue at the direction of one who may be mentally incompetent—that is, one who seems unable to comprehend the nature of the proceedings against him—serves neither the individual client nor the truth-seeking process." 155 F.3d at 1187.

¶ 89 Initially, we do not address this claim of error under the premise that Appellant was not competent to stand trial. As addressed above, Appellant failed to rebut the statutory presumption of competency. Therefore, this was not a situation of counsel following the wishes of a mentally incompetent client. Further, we have held that counsel is not *per se* ineffective for failing to present mitigating evidence in a capital case. *Hooper v. State,* 947 P.2d 1090, 1115 (Okl.Cr. 1997), *cert. denied,* 524 U.S. 943, 118 S.Ct. 2353, 141 L.Ed.2d 722 (1998). *See also Brecheen v. Reynolds,* 41 F.3d 1343, 1368 (10th Cir.1994). In *Wallace,* this Court set out guidelines to assist counsel and the trial court is situations where the defendant does not want to put on mitigating evidence. This Court stated:

(1) The court must inform the defendant of the right to present mitigating evidence, and what mitigating evidence is.

(2) The court must inquire both of the defendant and his attorney (if not pro se) whether he or she understands these rights.

(3) The court should also inquire of the attorney if he or she has attempted to determine from the defendant whether there exists any evidence which could be used to mitigate the aggravating circumstances proven beyond a reasonable doubt by the prosecution.

(4) If such information has been given, the attorney must advise the court what that mitigating evidence is; if the defendant has refused to cooperate, the attorney must relate that to the court.

(5) The trial court must inquire of a defendant and make a determination on the record whether the defendant understands the importance of mitigating evidence in a capital sentencing scheme, understands such evidence could be used to offset the aggravating circumstances proven by the prosecution in support of the death penalty, and the effect of failing to present that evidence.

(6) After being assured the defendant understands these concepts, the court must inquire of the defendant whether he or she desires to waive the right to present such mitigating evidence.

(7) Finally, the court should make findings of fact pursuant to *Grasso*, [857 P.2d 802 (1993)] of the defendant's understanding and waiver of rights.

893 P.2d at 512–513.

 ¶ 90 In the present case, the trial court thoroughly followed each of the *Wallace* guidelines. After his inquiry of Appellant, the trial court asked defense counsel to provide a brief summary of the mitigating evidence for the record. The summary of evidence included testimony from Sue Eply, the mother of a friend of Appellant; Sue Watkins, a jailor at the Pittsburg County Jail; Appellant's mother, Carol Sue Ryder, and his brother, Mitch Ryder. This summary of evidence was conducted in Appellant's presence. Appellant remained adamant in his wish not to have any family

members testify at his trial and not to have any mitigating evidence presented to the jury. After the summary of evidence was provided, the trial court again inquired of Appellant. The court essentially repeated a portion of the earlier inquiry. Appellant again indicated he understood his right to present mitigating evidence and what that mitigating evidence would be. He indicated he understood his rights at trial and on appeal, and the possible consequences of refusing to present mitigating evidence. The trial court subsequently found Appellant competent and desiring to proceed without the presentation of any mitigating evidence. The trial court also informed Appellant that up until the time the jury was sent out for deliberations, he could change his mind and have the mitigating evidence presented. Appellant did not change his mind.

¶ 91 In anticipation of a claim of ineffective assistance of counsel, in the event of an appeal, due to the failure to present mitigating evidence the trial court allowed defense counsel to present mitigating evidence to the jury. Sue Eply and Sue Watkins testified in Appellant's behalf.

 ¶ 92 Appellant argues that by allowing him to dictate what witnesses could or could not be called, and effectively take charge of the defense, the trial court denied him the effective assistance of counsel. It is well established that a defendant has the right to preclude testimony of mitigating witnesses. *Wallace*, 893 P.2d at 510. *See also Hale v. Gibson*, 227 F.3d 1298, 1316 (10th Cir.2000).[5] By allowing Appellant to exercise his right not to present mitigating evidence, the trial court was not allowing the defendant to take charge of the case. Further, Appellant's argument is not persuasive in this case as the trial court permitted defense counsel to present 2 of the 4 mitigation witnesses planned. The only mitigation witnesses not presented were family members. While the testimony of family members can certainly be important, the failure to present such,

---

5. A competent client is empowered to make critical decisions regarding the trial of his/her case. Lawyers do not own a case in which they serve as counsel. *See* Rule 1.2, *Oklahoma Rules of Professional Conduct*, Title 5, Ch.1, App.3–A (2002). As long as the decision is knowing and voluntary, a client should be able to make decisions regarding evidence to be presented. In the present case, Appellant made a knowing and voluntary decision not to present mitigating evidence.

particularly in light of Appellant's wish not to present that testimony, is not necessarily deficient performance by counsel. In her *in camera* testimony, Appellant's mother did not testify to any mental illness or prior treatment for a mental illness on Appellant's part. She merely stated he seemed depressed. Similarly, Appellant's brother, according to defense counsel, would not have testified to any mental illnesses or treatments for such experienced by Appellant. He would have testified that Appellant seemed depressed, lonely, sad, and was becoming more suspicious and distrustful of the government. Based upon the nature of the crime committed in this case, the strength of the State's case against Appellant, both in the first stage and in the second stage, we do not believe that the testimony from Appellant's family members would have created a reasonable probability that the jury would have sentenced Appellant to life in prison. *See Hale,* 227 F.3d at 1317.

¶ 93 Appellant has failed to show either deficient performance by counsel or prejudice from counsel's conduct. Therefore, we find Appellant has not met either prong of *Strickland.* This assignment of error is denied.

### ACCUMULATION OF ERROR CLAIM

¶ 94 In his eleventh assignment of error, Appellant contends the aggregate impact of the errors in this case warrants reversal of his convictions and at the very least modification of his death sentence. This Court has repeatedly held that a cumulative error argument has no merit when this Court fails to sustain any of the other errors raised by Appellant. *Ashinsky v. State,* 780 P.2d 201, 209 (Okl.Cr.1989); *Weeks v. State,* 745 P.2d 1194, 1196 (Okl.Cr.1987). None of the assignments of error herein have merit; therefore, this cumulative error argument is rejected.

### MANDATORY SENTENCE REVIEW

¶ 95 In his tenth assignment of error, Appellant contends the death sentence should be modified to life imprisonment or life imprisonment without parole based upon the weight of the mitigating evidence presented

and the insufficiency of the evidence supporting the aggravating circumstances. We address Appellant's claim of error in conjunction with our mandatory sentence review.

¶ 96 Pursuant to 21 O.S.2001, § 701.13(C), we must determine (1) whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor, and (2) whether the evidence supports the jury's finding of the aggravating circumstances as enumerated in 21 O.S.2001, § 701.12. Turning to the second portion of this mandate, the jury found the existence of two (2) aggravating circumstances as to the murder of Daisy Hallum: 1) the defendant knowingly created a great risk of death to more than one person; and 2) there was an existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. 21 O.S.1991, § 701.12(2) and (7).

¶ 97 In Proposition Seven we found the aggravator of "continuing threat" was supported by sufficient evidence. In Proposition Eight, we found the aggravator "great risk of death" was supported by sufficient evidence.

¶ 98 Turning to the mitigating evidence, Appellant presented two witnesses: Sue Eply and Sue Watkins. Ms. Eply testified Appellant was friends with her sons and she had known him for approximately ten years. She stated she was never in fear for her safety when she was around him. She said he was fair, honest and decent. Ms. Eply characterized Appellant as a loner who didn't believe in owing anything to anyone and who wanted to pay his own way. She said she was aware that Appellant visited and called his family in Georgia often. She said that while Appellant had been in jail she had contacted him, and that she would continue to stay in contact with him should he be in prison for the rest of his life. Sue Watkins, a jailer at the Pittsburg County Jail, testified she had known Appellant for approximately a year and half, while he had been in the jail. She said he had not caused any problems in the jail and was a very quiet person. Additionally, the jury was given the following list of mitigating circumstances in their instructions: 1) the defendant did not have any

significant history of prior criminal activity; 2) the defendant is likely to be rehabilitated; 3) the defendant has behaved well while in the Pittsburg County Jail; 4) the defendant was a hard worker; 5) cooperation by the defendant with authorities; 6) the defendant's age; 7) the defendant's emotional/family history; and 8) the defendant has a family who loves and cares for him.

¶ 99 Upon our review of the record and careful weighing of the aggravating circumstances and the mitigating evidence, we find the sentence of death to be factually substantiated and appropriate. Under the record before this Court, we cannot say the jury was influenced by passion, prejudice, or any other arbitrary factor contrary to 21 O.S. 2001, § 701.13(C), in finding that the aggravating circumstances outweighed the mitigating evidence. Accordingly, finding no error warranting reversal or modification, the **JUDGMENTS** and **SENTENCES** are **AFFIRMED.**

JOHNSON, P.J. and LILE, V.P.J.: concur.

CHAPEL and STRUBHAR, JJ.: concur in result.