LEWIS, P.J., SMITH, V.P.J., LUMPKIN, and C. JOHNSON, JJ.: concur.

2013 OK CR 14

**Roderick L. SMITH, Appellant,**

**v.**

**The STATE of Oklahoma, Appellee.**

**No. D–2010–357.**

Court of Criminal Appeals of Oklahoma.

Aug. 7, 2013.

560

Cathy Hammarsten, Shea Smith, Assistant Public Defenders, Oklahoma City, OK, attorneys for defendant at trial.

Sandra Elliott, Suzanne Lister, Assistant District Attorneys, Oklahoma City, OK, attorneys for the State at trial.

Marva A. Banks, Assistant Public Defender, Oklahoma City, OK, attorney for appellant on appeal.

E. Scott Pruitt, Attorney General of Oklahoma, Robert Whittaker, Assistant Attorney General, Oklahoma City, OK, attorneys for the State on appeal.

## OPINION

C. JOHNSON, J.

¶ 1 Appellant, Roderick L. Smith, was convicted by a jury in Oklahoma County District Court, Case No. CF–1993–3968, of five

counts of First Degree Murder, 21 O.S.1991, § 701.7(A) He was originally sentenced to death on all five counts. This Court affirmed his convictions and sentences on direct appeal. *Smith v. State*, 1996 OK CR 50, 932 P.2d 521. The United States Supreme Court denied *certiorari*. *Smith v. Oklahoma*, 521 U.S. 1124, 117 S.Ct. 2522, 138 L.Ed.2d 1023 (1997). This Court subsequently denied Appellant's first application for post-conviction relief. *Smith v. State*, 1998 OK CR 20, 955 P.2d 734. In 2002, while Appellant was seeking *habeas corpus* relief in the federal courts,[1] the United States Supreme Court held that imposition of the death penalty against mentally retarded individuals violated the Eighth Amendment's ban on cruel and unusual punishment. *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). Petitioner then filed a successor application for post-conviction relief in this Court, claiming that under the new rule announced in *Atkins*, he was ineligible for the death penalty because he was mentally retarded. We remanded the case to the district court for that factual determination. *Smith v. State*, Case No. PCD–2002–973 (Okl.Cr. Aug. 5, 2003) (not for publication).

¶ 2 In March 2004, an Oklahoma County jury concluded that Appellant was not mentally retarded.[2] In August 2004, the Tenth Circuit Court of Appeals ruled on Appellant's still-pending *habeas* action. That Court denied relief on claims relating to Appellant's guilt, but concluded that he had been denied his Sixth Amendment right to effective assistance of counsel at the sentencing stage of his original trial, and remanded for a new capital sentencing proceeding. *Smith v. Mullin*, 379 F.3d 919 (10th Cir.2004). This Court subsequently reviewed the proceedings from Appellant's 2004 mental-retardation trial, and affirmed the jury's verdict. *Smith v. State*, Case No. O–2006–683 (Order issued Jan. 29, 2007; not for publication).

¶ 3 Once the issue of Appellant's eligibility for the death penalty after *Atkins v. Virginia* was resolved, his capital resentencing trial proceeded. First, Appellant challenged his competency to be re-sentenced. At a trial held in November 2009, before the Honorable Jerry D. Bass, District Judge, a six-member jury unanimously concluded that Appellant was competent. The capital resentencing trial, also before Judge Bass, began in earnest in February 2010. That jury found three aggravating circumstances supporting the death penalty as to all five murders: (1) that Appellant had previously been convicted of a felony involving the use or threat of violence to the person; (2) that Appellant knowingly created a great risk of death to more than one person; and (3) that the murder was especially heinous, atrocious, or cruel. As to two of the counts (Counts 2 and 5), the jury also found the existence of a fourth aggravating circumstance—that the murder was committed for the purpose of avoiding or preventing lawful arrest or prosecution. The jury recommended sentences of life without parole for the first three counts, but a sentence of death on the latter two. On April 14, 2010, the district court imposed sentence in accordance with the jury's recommendation.[3] The instant appeal embraces both the February 2010 finding that Appellant was competent to be re-sentenced, and the subsequent re-sentencing trial.

## SUMMARY OF THE FACTS

¶ 4 Appellant was convicted of murdering his wife, Jennifer Smith, and her four children from a prior relationship—ten-year-old Shameka Carter, nine-year-old Glen Carter Jr., seven-year-old Ladarian Carter, and six-year-old Kenisha Carter—at the family's Oklahoma City home in June 1993. Four of the bodies were hidden in closets; one child's body was found under a bed. The state of

---

1. Appellant initially sought *habeas corpus* relief from in the United States District Court for the Western District of Oklahoma. That court denied relief, *Smith v. Gibson*, No. CIV–98–601–R (W.D.Okla., Jan. 10, 2002; not for publication), and Appellant appealed that denial to the United States Court of Appeals for the Tenth Circuit.

2. A first attempt at a mental-retardation trial had ended in a mistrial in late 2003.

3. Appellant's opening brief was filed February 21, 2012. The State's response was filed July 5, 2012. Appellant filed a reply brief July 25, 2012. Oral argument before this Court was held May 7, 2013.

decomposition suggested the victims had been dead for at least several days. The day the bodies were discovered, Appellant voluntarily presented himself at the police station, and was arrested after confessing to the crimes. Appellant's descriptions of where he had hidden each body were consistent with what the police discovered.

¶ 5 Autopsies showed that Jennifer Smith suffered multiple stab wounds, one in particular which could have proven fatal. One child, Ladarian, exhibited several serious stab wounds which could have caused his death. Appellant's two step-daughters showed no signs of trauma, suggesting that they may have been asphyxiated. The body of the fourth child, Glen Jr., was too badly decomposed to determine the cause of his death.

¶ 6 In its quest for the death penalty, the State presented evidence supporting five aggravating circumstances. First, the fact that Appellant had created a great risk of death to more than one person was not contested. Second, Appellant had previously been convicted of a violent felony—specifically, for repeatedly stabbing a former girlfriend in 1986. Third, the prior stabbing, coupled with Appellant's attack on a prison guard and the circumstances surrounding the murders in this case, were used to support the State's claim that Appellant constituted a continuing threat to society. Fourth, the State argued that all of the victims in this case suffered such that the murders were especially heinous, atrocious, or cruel. Finally, the State contended that all of the murders were committed for the purpose of avoiding arrest or prosecution. The State also presented victim-impact testimony from Jennifer Smith's mother, the biological father of her murdered children, and other relatives.

¶ 7 Appellant's case in mitigation focused primarily on his intellectual deficits. He presented evidence that as a young child, he had almost drowned, and that subsequent brain scans indicated organic brain damage. He presented a substantial amount of lay and expert testimony to show that he suffered from cognitive deficits, and to suggest that

he was mentally retarded. Relatives described Appellant as quiet and slow; he attended special-education classes in grade school. Various witnesses, particularly those who had encountered him since the murders, doubted his ability to read, write, or understand the nature of the charges against him. A considerable amount of testimony was offered showing Appellant scored very low on numerous I.Q. tests and similar assessments.

¶ 8 The State presented its own lay and expert testimony showing that, even if Appellant was of sub-normal intelligence, he was able to function quite normally when he wanted to. For example, when he first met with police, Appellant appeared unable to comprehend his circumstances or give even the most basic information. Eventually, however, Appellant's demeanor changed, and he conversed with detectives more freely, describing the events surrounding the murders in what would appear to be a relatively normal (if emotional) manner.[4] The State also pointed out that Appellant was able to make excuses for his actions (claiming, *e.g.*, that his wife had tried to poison him), and that at one point he fabricated a story that the murders had been committed by a fictitious federal drug-enforcement agent, who was allegedly having an affair with Appellant's wife. The State also presented evidence that Appellant had held jobs as a cashier and janitor, and that any intellectual deficits he might have had were not apparent to his employers. Nor were they apparent to the women he had affairs with, including the one he stabbed in 1986.

## DISCUSSION

¶ 9 Appellant's guilt in the murders of his wife and four step-children is not at issue here. Both this Court and the federal courts have already considered and rejected claims bearing on the issue of guilt. The focus of Appellant's resentencing trial was on the appropriate punishment for these crimes. Nevertheless, specific facts about the murders were relevant to the sentencing decision, *e.g.*, whether the murders were "espe-

---

4. Video-taped recordings of Appellant's interviews with police were presented to the jury at the re-sentencing trial, and are included in the record on appeal.

cially heinous, atrocious, or cruel." These details are discussed below as they become relevant.

¶ 10 On the other hand, Appellant's intellectual functioning has been a recurring issue, in some form or another, throughout the long history of this case. Lay and expert testimony about Appellant's mental functioning has been advanced (1) as relevant to his eligibility for the death penalty after *Atkins v. Virginia;* (2) as relevant to his competency to stand trial (or to be re-sentenced); and (3) as mitigating evidence, to show that he is deserving of a sentence less than death. The first purpose—whether Appellant is mentally retarded—has been fully litigated and finally adjudicated in prior proceedings. The second and third purposes are properly before the Court in this resentencing appeal.

¶ 11 The jury at Appellant's competency trial, and the jury at his capital re-sentencing trial, heard substantially the same evidence about Appellant's intellectual abilities for technically different purposes. That body of evidence includes observations and opinions about Appellant, not only throughout the 20–year history of this prosecution, but further back to his childhood. Both juries heard testimony from family members, grade-school officials, special-education teachers, and others, suggesting that Appellant's limited intellectual abilities were noticed at an early age. The State, in turn, rebutted that evidence with its own law and expert testimony.

### A. Issues relating to the competency trial.

¶ 12 Appellant's first seven propositions of error deal with the competency trial held in November 2009. In Proposition 1, he complains that he was not allowed to re-litigate the issue of his alleged mental retardation at the competency trial. In Proposition 2, he claims the trial court erred by making certain revisions to the Uniform Jury Instructions given at the competency trial, which reflected the trial court's rulings on the issue of mental retardation. Because these claims are closely related, we address them together.

¶ 13 After our remand for a hearing consistent with *Atkins v. Virginia,* an Oklahoma County jury concluded in March 2004 that Appellant was not "mentally retarded," as that term is defined by law.[5] We later affirmed that finding. In challenging his present competency to undergo a capital re-sentencing trial, Appellant again pointed to evidence of his low intellectual functioning. The State objected, pointing out that the issue of Appellant's mental retardation had already been fully litigated. The trial court ruled that however the defense sought to prove his incompetency, it should refrain from mentioning the issue of "mental retardation" *per se.* For the same reason, the trial court modified the Uniform Jury Instructions and verdict form used at the competency trial to remove references to the term "mental retardation." Appellant claims these rulings denied him a fair competency trial. The issue was vigorously contested by the parties below, and is fully preserved for appellate review.

¶ 14 In the interests of efficiency and finality, our judicial system employs various doctrines to ensure that issues are not endlessly re-litigated. The doctrine of *res judicata,* or claim preclusion, bars the re-litigation of claims once they have been finally adjudicated. The doctrine of collateral estoppel, or issue preclusion, holds that when an ultimate issue has been determined by a valid and final judgment, it cannot be re-litigated by the parties in some future lawsuit. *Carris v. John R. Thomas & Assoc., P.C.,* 1995 OK 33, ¶ 9, 896 P.2d 522, 527. The State invokes both doctrines to defend the trial court's ruling. Whether mental retardation is viewed as a "claim" or an "issue," in the State's view, the question has been decided against Appellant by a verdict from the *Atkins* jury in 2004, which was affirmed by this Court in 2007. *See Alverson v. State,* 1999 OK CR 21 ¶ 6, 983 P.2d 498, 506 (defen-

---

**5.** In *Atkins,* the Supreme Court outlined criteria relevant to defining mental retardation, but left it to the States to formulate their own definitions. In *Murphy v. State,* 2002 OK CR 32, 54 P.3d 556, we promulgated a definition for use in capital trials pending legislation addressing the issue, which appeared in 2005. Laws 2004, S.B. 1583, c. 106, § 1, eff. April 1, 2005.

dant was estopped from complaining about dual-jury procedure used in his and his co-defendant's trials, as this Court had already denied the co-defendant's request for extraordinary relief on the same issue).

■ ¶ 15 The State also argues that the trial court's ruling was proper under the "law of the case" doctrine, which holds that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case. The doctrine helps to guide judicial discretion in those subsequent stages. *See generally Pepper v. United States,* —— U.S. ——, 131 S.Ct. 1229, 1251, 179 L.Ed.2d 196 (2011); *Bromley v. Crisp,* 561 F.2d 1351, 1363 (10th Cir.1977); *Barnett v. Barnett,* 1996 OK 60, ¶ 13, 917 P.2d 473, 477. The "law of the case" doctrine seems particularly applicable here. Before the competency trial began, Appellant sought a writ from this Court to countermand the trial court's ruling, and allow him to try to convince the competency jury that he was mentally retarded. We denied the request. *Smith v. Bass,* Court of Criminal Appeals Case No. PR–2009–707 (August 26, 2009; not for publication). In other words, the trial court did not allow the parties to re-litigate the issue of whether Appellant was mentally retarded, because this Court denied Appellant's request to tell that court to do otherwise.

¶ 16 Despite this, Appellant points out (1) that the constitutional concerns of an *Atkins* trial and a competency trial are different; (2) that the ultimate issues in each trial are different; and (3) that even if a defendant is not "mentally retarded" per *Atkins,* he may still be impaired "to some degree" that bears on his competency to stand trial. It is certainly true that an *Atkins* hearing relates to the Eighth Amendment's ban on cruel and unusual punishment (*i.e.,* excepting the mentally retarded from the death penalty), while a competency hearing concerns the Fifth Amendment right to due process (the right not to be tried while incompetent). However, the fact that the ultimate issue in each proceeding is different does not advance Appellant's argument.

¶ 17 Whether Appellant is "mentally retarded" under *post-Atkins* Oklahoma law has

been decided against him. But as we discuss more fully in relation to Proposition 2, while a defendant's mental capacity is certainly relevant to the question of his competency, whether he is "mentally retarded" as a matter of law is not determinative of that verdict. Appellant's argument confuses the ultimate legal issue of mental retardation with the evidence used to support that claim. Appellant has conflated "a determination necessary to the bottom-line judgment"—the *Atkins* verdict—with "a subsidiary finding that, standing alone, is not outcome determinative." *Bobby v. Bies,* 556 U.S. 825, 835, 129 S.Ct. 2145, 2153, 173 L.Ed.2d 1173 (2009).

■ ¶ 18 In *Blonner v. State,* 2006 OK CR 1, 127 P.3d 1135, we held that once a jury at an *Atkins* trial has found that a capital defendant is not mentally retarded, the issue of mental retardation cannot be re-litigated at the capital trial itself. "However," we explained, "evidence of the Defendant's intellectual functioning and deficits may be presented as mitigating evidence during second stage proceedings if the jury finds the defendant guilty." *Id.,* 2006 OK CR 1, ¶ 23, 127 P.3d at 1144. The same principle holds for a *post-Atkins* determination of competency. Consistent with *Blonner,* the trial court in this case did not allow the issue of mental retardation *per se* to be re-litigated in the competency trial. However, the more general question—whether Appellant suffered from limited intellectual ability—*was* freely litigated. The court allowed the defense to present any evidence of intellectual functioning that was relevant to the ultimate issue of Appellant's present competency. This included evidence that Appellant attended special-education classes as a child, his scores on a number of I.Q. tests, and many other relevant psychological assessments and lay observations. As a result, while witnesses at the competency trial were not allowed to opine whether Appellant was "mentally retarded" in the legal sense of the term, evidence of Appellant's intellectual abilities was essentially the same as that presented at the *Atkins* trial in 2004.

¶ 19. This leads us to the complaint raised in Proposition 2, which is that the trial court erred when it excised language about "men-

tal retardation" from the instructions and verdict form given to the competency jury. Again, the issue of mental retardation and its place in the competency trial was debated thoroughly below, and Appellant's complaints about the instructions and verdict form were fully preserved for appellate review.

¶ 20 When sufficient doubt about a defendant's competency has been raised, he may demand that a jury determine whether he has the present ability to "understand the nature of the charges and proceedings brought against him" and to "effectively and rationally assist in his or her defense." 22 O.S. Supp.2005, § 1175.1(1) Oklahoma law also gives the competency jury an opportunity to make special findings to aid the court in disposition of the defendant, should the jury initially determine that he is incompetent. If—and only if—the jury finds the defendant incompetent, it is then directed to answer (1) whether the defendant could be expected to regain competency, through treatment, therapy, or training, within a reasonable time; (2) whether the defendant is "mentally retarded"; (3) whether the defendant is a "person requiring treatment" (due to mental illness or drug or alcohol dependency); (4) whether there is some other reason for incompetency; and (5) whether the defendant is presently dangerous. *See* 22 O.S.2001, §§ 1175.4(E), 1175.5; Instruction Nos. 11–3, 11–5, 11–7, OUJI–CR (2nd) (outlining definitions and procedure for competency jury to make its findings); 10 O.S. Supp.2008, § 1408 (defining mental retardation); 43A O.S. Supp.2008 § 1–103(13) (defining "person requiring treatment").

■ ¶ 21 The trial court modified the instructions and verdict form to remove all of the specific findings (not just concerning mental retardation), such that the jury was only asked to conclude—yes or no—whether Appellant was competent to stand trial. Appellant claims these revisions prevented the jury from fully assessing evidence of his intellectual deficits. We disagree. The sequence of the questions promulgated by the Legislature, and reflected in the model verdict form, makes it clear that the only dispositive issue for the jury to answer, in a competency trial, is whether the defendant is

"competent" under Oklahoma law. If the jury concludes he is not competent, the additional questions set out in § 1175.5 are to guide the court in its disposition of the accused. 22 O.S. Supp 2005, § 1175.6. But if the defendant is found to be competent, the special questions are irrelevant; the jury's task is finished.

■ ¶ 22 Furthermore, the sequence of the questions shows that even if the jury finds the defendant incompetent, it is not required to predicate that finding on any specific "diagnosis." The jury could find the defendant incompetent based on the evidence, regardless of whether it believed him to be mentally retarded and/or in need of treatment; it could find him incompetent for any reason it specifies. This protocol is consistent with the notion that a person can be incompetent for any number of discrete reasons or combinations thereof. It is also consistent with the idea that a person with mental illness, or subnormal intellectual ability, is not necessarily incompetent to stand trial. Simply put, a person can be incompetent without being mentally retarded, and a person can be mentally retarded to some degree and yet still be competent to stand trial. *See Atkins,* 536 U.S. at 318, 122 S.Ct. at 2250 ("[m]entally retarded persons frequently know the difference between right and wrong and are competent to stand trial"); *Thomas v. State,* 249 S.W.3d 234, 239 (Mo.App.2008).

¶ 23 In conclusion, the tact that Appellant is not "mentally retarded" under Oklahoma law has been determined by a jury, and that verdict has been reviewed by this Court on appeal. The trial court did not err in concluding that the issue of mental retardation *per se* was not open to re-litigation. The trial court's revisions to the jury instructions and verdict form might have been unusual, but they were entirely proper given the unusual posture of this case. These rulings and revisions did not prejudice Appellant in any way. He does not claim the trial court barred any of his evidence regarding subnormal intellectual functioning or impaired social skills. All of that evidence was allowed on the issue of competency to stand trial, and that was the only material question the jury

had to answer. We find no error here. Propositions 1 and 2 are denied.

▮ ¶ 24 In Proposition 3, Appellant claims that he has been denied due process because he was not afforded an interlocutory appeal of the competency verdict before being subjected to the re-sentencing trial in February 2010. Of course, Appellant was afforded his right to review any and every aspect of the competency proceedings; those challenges take up the first seven propositions of error here. He simply contends that he was entitled to have those claims considered and resolved by this Court *before* he was re-sentenced on the charges themselves. However, Appellant offers no constitutional, statutory, or judicially-created authority for interlocutory review in this circumstance. *See* 22 O.S.2001, § 1051 (establishing a criminal defendant's right to appeal from a judgment rendered against him); 22 O.S. Supp. 2005, § 1175.5 (if the defendant is found competent to stand trial, criminal proceedings "shall be resumed"); *Alexander v. State*, 71 Okl.Cr. 47, 107 P.2d 811, 812–13 (1940) (findings on defendant's "present sanity" to face trial for murder was not an independently appealable order). Nor can Appellant show any prejudice by having to hold his complaints unless and until he has been convicted of, and sentenced for, the crime with which he is charged.[6] Challenges to competency proceedings are routinely addressed by this Court on direct appeal of a defendant's conviction. *See e.g. Grant v. State*, 2009 OK CR 11, ¶¶ 6–13, 205 P.3d 1, 7–10; *Marquez–Burrola v. State*, 2007 OK CR 14, ¶¶ 10–19, 157 P.3d 749, 754–57. A full record was made of the competency proceedings, and it is included in the record on appeal here. Nothing has been compromised or waived by requiring Appellant to challenge the competency proceedings in the larger context of his direct appeal. Proposition 3 is denied.

▮ ¶ 25 In Proposition 4, Appellant claims that during jury selection at the competency trial, he was unfairly required to use peremptory challenges to remove two panelists who should have been removed by the trial court for cause. When asked by defense counsel to give their opinions on the relative credibility of certain kinds of witnesses, Panelist S. admitted that he would have difficulty believing a witness who was a convicted murderer; Panelist P. said she would tend to give a police officer more credence than other witnesses. These answers were of concern to the defense, because its witness list included two convicted murderers, and the State intended to present testimony from police officers. Defense counsel challenged both panelists for cause. When the trial court made further inquiry, both panelists explained that they could, and would, give every witness their attention, and would not automatically believe or discount any witness based solely on their criminal history or their occupation.

¶ 26 The law does not require a juror to believe anything that any witness says. Nor does the law prevent jurors from applying their own experiences in weighing any particular witness's credibility. Instruction No. 10–8, OUJI–CR (2nd).[7] Indeed, the law cautions jurors to give certain facts particular attention when deciding whether a witness is telling the truth, e.g., whether he is a felon, whether he has been convicted of any crime involving dishonesty, or whether he could be considered an accomplice to the charged crime. *See* 12 O.S.Supp.2004 § 2609; Instruction Nos. 9–22, 9–28, OUJI–CR (2nd). The trial court's colloquies with these panelists were straightforward and entirely proper. They were consistent with the goal of *voir dire:* to get panelists to speak candidly about their prejudices. The prejudices expressed by these panelists were not unusual in the least. But the fact remains that both

---

6. To obtain extraordinary relief (such as a stay in the trial proceedings and an interlocutory appeal of the competency verdict), a defendant must show that no other avenue will adequately protect his interests. Rule 10.6(A), (B), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18, App. (2013).

7. "It is your responsibility to determine the credibility of each witness and the weight to be given the testimony of each witness.... From all the facts and circumstances appearing in evidence and coming to your observation during the trial, aided by the knowledge which you each possess in common with other persons, you will reach your conclusions."

panelists agreed to follow the law and consider all the evidence presented to them.[8] The trial court did not err in refusing to remove these panelists for cause. *Wackerly v. State,* 2000 OK CR 15, ¶ 33, 12 P.3d 1, 12–13. Even if the court had erred, Appellant used peremptory challenges to remove these panelists anyway, and he did not tell the court which remaining panelists were unacceptable to him, in order to justify a request for additional peremptory challenges. Thus, Appellant failed to preserve this issue for review. *Jones v. State,* 2009 OK CR 1 ¶ 34, 201 P.3d 869, 880. We find no error, plain or otherwise, and Proposition 4 is denied.

¶ 27 In Proposition 5, Appellant claims that the jury's ability to fairly consider his competency was destroyed when a witness mentioned that Appellant had been on "death row." The comment was made by a witness called by the defense. Tommy Bradley, a multiple felon, was asked to relate his experiences with Appellant while the two were housed in the Oklahoma County Jail in 2006–07. According to defense counsel's assertions in the record, Bradley was cautioned before he took the witness stand not to make any reference to the fact that Appellant had been convicted of a capital crime. Bradley began by relating specific instances of what Appellant did, and he seemed capable (or incapable) of doing, while in the jail.

¶ 28 Bradley was also asked to relate the kinds of things the two men talked about. On cross-examination, he told the prosecutor that Appellant mostly talked about his days at "OSP [Oklahoma State Penitentiary], where he has been living." Defense counsel did not object to that reference, or ask to caution her witness. On redirect, defense counsel followed the same line of questioning, trying to point out that Appellant's description of conditions at the penitentiary did not

match reality. After a few more rounds of questioning on this subject, Bradley mentioned that Appellant was on "death row at McAlester." Defense counsel asked to approach; questioning of this witness stopped; the court released the jury for the rest of the day, and conferred with counsel about what to do next. Ultimately, the court denied the defense request for a mistrial, but questioned each juror and alternate individually on whether Bradley's last comment would affect their ability to deliver a fair verdict. The one juror who doubted her ability to disregard the comment was excused, without objection by the State; the trial continued with the alternate in her place.

¶ 29 The State does not dispute that the witness's comment was irrelevant to the issues before the competency jury; and Appellant does not claim that the comment was maliciously interjected by the witness, or that it was elicited in bad faith by the prosecutor. Given the nature of the questioning from both attorneys, the conclusion that this hapless witness must have felt is understandable. Our only task is to determine whether the trial court's remedy was sufficient to cure the error.

¶ 30 Appellant claims that once they learned he was (or had been) on "death row," the competency jurors were unable to fairly decide the issue before them. He likens the situation to that in *Lambert v. State,* 2005 OK CR 26, ¶ 17, 126 P.3d 646, 654–55. Lambert was convicted of two counts of capital murder and sentenced to death on each. In a situation similar to Appellant's, we remanded Lambert's case after *Atkins v. Virginia* for a determination of whether he was exempt from the death penalty due to mental retardation. A jury subsequently found that Lambert was not mentally retarded. However, on review, a majority of this Court found that no rational juror could have ar-

---

**8.** The trial court asked Panelist S., "Are you telling me at this time that you would disregard, no matter what that testimony is and how it relates to the rest of the case, are you telling me that you would disregard that testimony?" Panelist S. replied, "No." During the colloquy with Panelist P., the following took place:

THE COURT: Would you reserve your opinion and judge the credibility of a witness based on that witness's testimony, or are you going to

automatically lend more credence to the testimony of a police officer?

PANELIST P.: Well, I feel like I could be unbiased, but I mean—

THE COURT: If you're a police officer, do you automatically win?

PANELIST P.: No.

THE COURT: Okay. Can you be fair to both sides . . . in your heart and in your mind?

PANELIST P.: I think so.

rived at that conclusion, and we modified Lambert's death sentences. We went on to address several other claims of trial error (even though our disposition of the sufficiency-of-evidence claim rendered these other arguments moot). We found that the jury panel had been tainted when, during *voir dire*, one panelist recalled that Lambert and his accomplice had "kidnapped a woman and a man and put them in the trunk of a car and set it on fire." *Id.* at ¶ 15, 126 P.3d at 654. We found this taint exacerbated by prejudicial details surrounding Lambert's capital crimes, as well as other crimes and unadjudicated bad acts, presented throughout the trial itself. In the State's estimation, details about Lambert's crimes reflected on his mental abilities. We essentially found the presentation to be overkill. We observed that the rules of evidence-which require the balancing of probative value against unfairly prejudicial effect—were "disregarded" throughout the trial. *Id.* at ¶ 18, 126 P.3d at 655. With regard to Lambert's capital crimes in particular, "[n]o attempt was made to narrowly confine any evidence which could have been relevant to mental retardation." *Id.* at ¶ 26, 126 P.3d at 657.

¶ 31 The rules of evidence guide trial courts in evaluating the admissibility of evidence. The nature of the proceeding, and the respective theories and strategies of each party, determine whether particular evidence is relevant or not. In *Lambert* we acknowledged that conducting an *Atkins* jury trial for a defendant who has already been convicted of capital crimes is "difficult and fraught with danger." *Lambert,* 2005 OK CR 26 at ¶ 30, 126 P.3d at 658. A jury trial on the issue of competency, particularly in a capital case, presents the same sorts of dangers. The defendant may not be "on trial" for a particular crime, but his entire life history may come under the microscope. Deciding what evidence is relevant in such proceedings is hard enough; deciding when arguably relevant evidence is nevertheless too prejudicial to give to the jury is harder still. With court and counsel working together, a plan to redact the presentation of evidence, to remove shocking or distracting details, is admirable and necessary. Still, no one can tell what the occasional witness might accidentally divulge. That much is apparent from the instant case.

¶ 32 Usually, a defendant's competency to stand trial is litigated before his criminal trial. In those cases, there is a danger of letting the evidence concerning the charges themselves invade and distract from the precise question before the competency jury. There are also times where a defendant's competency must be evaluated retrospectively—after he has been convicted and sentenced. *See e.g. Tate v. State,* 1995 OK CR 24, ¶¶ 1–5, 896 P.2d 1182, 1185. These latter cases present the additional danger of the competency jury learning what punishment some other fact-finding body felt the crime deserved. In the case before us, despite the fact that Appellant faced re-sentencing only if found competent, he had been sentenced to death by a jury in the past. In any of these situations, the competency jurors may be naturally curious as to what effect their verdict might have on the defendant's future.

¶ 33 On many occasions, we have held that facts surrounding the defendant's crime may be relevant to the issue of competency. *See Littlejohn v. State,* 1998 OK CR 75, ¶ 13, 989 P.2d 901, 906 (defendant's trial testimony could be considered by jury in a retrospective competency trial); *Bryan v. State,* 1997 OK CR 15, ¶ 9, 935 P.2d 338, 349 (facts concerning defendant's capital crimes were "properly before the jury" in retrospective competency trial); *Boltz v. State,* 1991 OK CR 1, ¶ 13, 806 P.2d 1117, 1122 (defendant's testimony at his capital trial was admissible in retrospective competency proceeding); *Campbell v. State,* 1981 OK CR 136, ¶¶ 7–8, 636 P.2d 352, 354 (holding that in a competency trial, it is not improper to refer to the nature of the charges the defendant is facing, because that information is essential to deciding whether the defendant is capable of understanding the charges against him). *Lambert* simply serves as a reminder that even probative value can be outweighed by substantially unfair prejudice or confusion of the issues.

¶ 34 In any event, here the court and counsel followed *Lambert's* admonitions. As a result, *Lambert* is markedly distinguishable

from the situation in this case.[9] The jury in *Lambert* did not just learn that the defendant had been accused or convicted of capital crimes; it heard considerable details about those crimes and others that the defendant had committed. No such details were divulged to the jury here. The trial court and counsel for both parties made Herculean efforts, every step of the way, to avoid eliciting details about Appellant's crimes during the competency trial.

¶ 35 Nevertheless, the testimony gave unavoidable clues about Appellant's situation. In arguing for a mistrial after Bradley's comment, defense counsel was concerned that the jurors would be able to "connect the dots" and conclude that Appellant had committed capital murder. But even without Bradley's comment, any juror who paid attention during this proceeding was bound to have realized almost as much. His own witnesses included his criminal defense attorney in 1993, other defense lawyers, and a couple of cell-mates; the State's witnesses included corrections officials and police detectives who had interacted with Appellant over the years. It was apparent that Appellant had been in serious legal trouble at least since 1993, and that he had been in custody since that time. One witness agreed that Appellant had a "huge amount to gain" by feigning subnormal intelligence. The jury learned that one of Appellant's recent cell-mates was a convicted murderer. There were repeated references to Appellant's "case," some sort of incident involving his wife, Jennifer Smith, and a bo-

gus alibi involving a federal agent supposedly having an affair with her. Appellant's first defense lawyer recalled being shocked at Appellant's denials and initial reactions to his situation, given that the incident involved his "whole [ ] family." The jury heard from Jennifer Smith's brother and mother, but Jennifer herself was noticeably absent. So were her children, whom the jury knew had lived with Appellant and Jennifer. Their biological father, Glenn Carter, testified, but the children never came to the witness stand. Even without Bradley's comment, jurors could easily have surmised that many years ago, Appellant had been accused of killing his wife—and probably her children—and that he had gone to prison for it.

¶ 36 We return, then, to the question of whether a single, spontaneous reference to Appellant having been on "death row," by itself, rises to the level of unfair prejudice which would undermine our confidence in the jury's verdict in this case? We cannot say that it does.

¶ 37 First, we place considerable importance on the trial court's colloquy with the each juror and alternate, privately, after the offending comment was made. That colloquy yielded one juror who admitted that the comment would impair her ability to render a fair verdict. The State had no objection to excusing her. The other jurors and alternates assured the court that the comment would not prevent them from fairly consider-

---

9. In fact, the *Lambert* opinion relied on by Appellant is the last in a string of *Lambert* opinions. Like Appellant, the defendant in *Lambert* was tried before *Atkins*, and used evidence of his intellectual deficits to challenge his competency to stand trial. After *Atkins* (and after he had already been found competent, tried, convicted, and sentenced to death), Lambert was afforded an opportunity to use that evidence for a legally distinct purpose, *i.e.*, to show that he was mentally retarded and therefore exempt from the death penalty. To further complicate matters, even before the *Atkins* remand Lambert's competency had to be re-evaluated when the United States Supreme Court held that the burden of proof originally used was unconstitutional. In short, Lambert's mental abilities were considered by several juries, in several different proceedings, long after he had been convicted of capital murder. In Lambert's first appearances before this Court, we found no error in allowing the State to

present some evidence of his crimes as relevant to the issue of competency. *Compare Lambert v. State*, 2003 OK CR 11, ¶ 3, 71 P.3d 30, 31 (in remanding for *Atkins* trial, this Court held, "the jury should not hear evidence of the crimes for which [the defendant] was convicted, unless particular facts of the case are relevant to the issue of mental retardation. Any such evidence should be narrowly confined to that issue") with *Lambert v. State*, 1999 OK CR 17, ¶ 25, 984 P.2d 221, 230 (defendant's confession to capital crimes was relevant and admissible at retrospective competency trial) and *Lambert v. State*, 1994 OK CR 79, ¶¶ 16, 32–36, 888 P.2d 494, 499, 501–02 (defendant's confession to capital crimes was properly admitted in retrospective competency trial; jury's knowledge of the charge is "essential" to deciding whether defendant has the present mental capacity to appreciate the nature of the charges against him).

ing the one question before them—Appellant's competency. Special mention is made in the record that the assurances were given without any hesitation. We trust jurors to tell the truth in *voir dire* about their biases and any prior knowledge of the case, and we generally accept what they tell us. Jurors remain under oath throughout the proceedings. We presume that they understand the solemnity of the situation, and that this will impress upon them the importance of thoughtful reflection on the answers they give. *Cf. Jones v. State*, 1988 OK CR 267, ¶ 10, 764 P.2d 914, 917 ("The presumption is that jurors are true to their oaths and conscientiously observe their instructions and admonitions").

¶ 38 When jurors are exposed to improper information, we afford great deference to the trial court's assessment of the situation. *Pavatt v. State*, 2007 OK CR 19, ¶ 34, 159 P.3d 272, 284. Put simply, the trial court is entrusted with fairly evaluating whether jurors' claims of enduring impartiality can be believed. We also presume that a trial court's instructions, and its admonitions to disregard improper evidence or commentary, are followed by the jurors absent some indication to the contrary. *Jones*, 1988 OK CR 267, ¶ 10, 764 P.2d at 917. Only in extreme cases is departure from this principle warranted. *Harmon v. State*, 2011 OK CR 6, ¶ 39, 248 P.3d 918, 935 (a trial court's admonition to the jury will cure the introduction of improper testimony, unless it appears that the evidence was so unfairly prejudicial that it determined the outcome of the trial).

> The rule that juries are presumed to follow their instructions is a pragmatic one, rooted less in the absolute certitude that the presumption is true than in the belief that it represents a reasonable practical accommodation of the interests of the state and the defendant in the criminal justice process.

*Richardson v. Marsh*, 481 U.S. 200, 211, 107 S.Ct. 1702, 1709, 95 L.Ed.2d 176 (1987).

¶ 39 In *Tate*, 1995 OK CR 24, 896 P.2d 1182, the defendant was convicted of murder-

ing his wife and another person; he was sentenced to death for the first murder, and to life imprisonment for the second. Several years later we remanded the case for a hearing to determine, retrospectively, whether the defendant had been competent to stand trial. At the competency trial, the jurors were aware that the defendant had already been convicted of murder, and that the competency trial was related to that case.[10] One panelist admitted in open court that she could not render a fair verdict if it might affect the "judgment of [19]87" (*i.e.* the original capital trial). The trial court excused that panelist, but refused to quash the entire panel based on this one comment. Because we saw no evidence that the comment had tainted other panelists, we found no error in the trial court's ruling. *Id.* at ¶¶ 18–20, 896 P.2d at 1188–89.

¶ 40 *Tate* is instructive here for another reason as well. During an overnight recess in the 1987 capital trial, some jurors were exposed to media reports about the case. The court questioned the panelists individually, and each unequivocally stated that the information they had received would not impair their ability to render a fair verdict. We held: "Absent specific evidence to the contrary, this Court must presume that the jurors openly and honestly answered each question posed regarding their exposure to media coverage of the case and its effects." *Id.* at ¶ 39, 896 P.2d at 1192.

¶ 41 In *Bryan*, 1997 OK CR 15, 935 P.2d 338, the defendant, already convicted of capital murder, was afforded a retrospective competency trial. Some evidence concerning the murder was introduced at that trial. During deliberations, the jury specifically asked the trial court what effect their verdict would have on Bryan's conviction and death sentence. The court refused to answer the question, telling the jurors that they had all the law and evidence necessary to render a verdict. We found no reversible error, observing that the jury had already been instructed not to speculate on such matters. *Id.* at ¶ 10, 935 P.2d at 349.

**10.** It is not clear from the opinion how much detail was discussed, but the jurors were told in *voir dire* that their verdict could not result in the defendant 'walking out of the courtroom.' *Tate*, 1995 OK CR 24, ¶ 20, 896 P.2d at 1189.

¶ 42 In assessing whether an admonition "cured" the error, we have long balanced the nature of the improper information against the quantum of properly-admitted evidence supporting the verdict. *See e.g. Hager v. State,* 1983 OK CR 88, ¶ 9, 665 P.2d 319, 323; *Kitchens v. State,* 1973 OK CR 356, ¶ 25, 513 P.2d 1300, 1304.

> The correct rule—that based upon sound reason, common experience, and good judgment—we think is, if the illegal evidence was of such a character as would ordinarily create such prejudice against the defendant as was reasonably calculated to make a fixed impression upon the minds of the jury and influence their verdict, and the court, from an examination of the whole case, is unable to say that such evidence did not probably affect the verdict, or that the verdict would not probably have been different, in any event, then the verdict should be set aside, and new trial ordered. This rule leaves the court to exercise some judgment as to the character and effect of the illegal evidence, and the question is not left to be determined by an arbitrary rule, without reference to the facts or conditions surrounding the case.

*Drury v. Territory,* 1900 OK 23, ¶ 34, 60 P. 101, 106.

¶ 43 The admonitions and assurances exchanged in this case might have been unconvincing in a case like *Lambert,* where details about the defendant's heinous crimes permeated the entire trial. In *Lambert* we concluded that the complained-of evidence "shifted the locus away from Lambert's mental capabilities and to his criminal actions," and that the jury's verdict "cannot be otherwise explained." *Lambert,* 2005 OK CR 26 at ¶ 30, 126 P.3d at 658. There was no such shift in focus in Appellant's competency trial. The parties scrupulously avoided discussing Appellant's crimes. The jury was not distracted by a barrage of prejudicial evidence, and its conclusion that Appellant was competent to understand the proceedings and rationally assist his attorney is supported by competent evidence. See Proposition 7. The trial court's handling of the matter was commendable, and certainly not an abuse of discretion. *Pavatt,* 2007 OK CR 19, ¶ 34, 159 P.3d at 284. Proposition 5 is denied.

¶ 44 In Proposition 6, Appellant complains that several of the State's witnesses at the competency trial related observations that were too remote in time to be relevant to his present competency. He did not object at trial to the testimony he now complains of, so we review this claim only for plain error. *Mitchell v. State,* 2011 OK CR 26, ¶ 72, 270 P.3d 160, 178–79. Appellant's argument relies on a passage from *Lambert v. State,* 1994 OK CR 79, ¶ 37, 888 P.2d 494, 502, where we stated that during a competency proceeding, testimony from lay persons who have observed the defendant's behavior is proper, "provided the observations are reasonably proximate in time to the competency trial." Focusing on the phrase, "reasonably proximate in time," Appellant claims that several witnesses related information that was too old to have any probative value. We disagree.[11]

¶ 45 In the competency trial, it was Appellant's burden to come forward with evidence rebutting the presumption of competency. 22 O.S.2001 § 1175.4(B) His specific claim was low intellectual functioning, which manifested itself when he was a child.[12] Indeed, Appellant concedes that his own evidence on this point reached back many years, all the way to his childhood. Yet he claims the State's evidence from the same time period was improper because (in Appellant's estimation) it failed to negate his claim of low intellectual functioning. This argument misses the point. The State was entitled to

---

11. Although *Lambert* has been cited several times on this point, *see e.g. Ryder v. State,* 2004 OK CR 2, 58, 83 P.3d 856, 870, the phrase appears to have been first used in the context of competency proceedings in *Campbell v. State,* 1981 OK CR 136, ¶ 14, 636 P.2d 352, 356.

12. Insofar as Appellant's competency challenge was related to a claim of mental retardation, early onset was a prerequisite. *Cf. Heller v. Doe,* 509 U.S. 312, 323, 113 S.Ct. 2637, 2644, 125 L.Ed.2d 257 (1993) (mental retardation is generally considered a "permanent, relatively static condition," not susceptible to marked improvement); 10 O.S.Supp.2005, § 1408(A) (mental retardation requires manifestation before age 18).

rebut Appellant's evidence with similar evidence from the same time period. Whether the State's evidence was ultimately convincing has nothing to do with whether it was relevant to the issue on which it was offered.[13] 12 O.S.2001, §§ 2401–02. There was no error here, plain or otherwise. Proposition 6 is denied.

¶ 46 In Proposition 7, Appellant challenges the jury's finding that he was competent to stand trial. He acknowledges that he carried the burden of overcoming a presumption of competency. He details the evidence supporting his claim that low intellectual functioning prevented him from understanding the nature of the criminal proceedings and being able to rationally assist his counsel. However, the test here is not the sufficiency of the evidence to support Appellant's claim of incompetency, but whether any rational juror could have reached the opposite conclusion. Appellant was required to establish his incompetency by a preponderance of evidence—that he was, more probably than not, unable to understand the nature of the proceedings and rationally assist in his defense. 22 O.S.Supp.2005, § 1175.1(2). Considerable evidence was presented on both sides of the issue. A rational juror could conclude that, more probably than not, Appellant was competent to be re-sentenced. *Ryder v. State*, 2004 OK CR 2, ¶ 59, 83 P.3d 856, 870. Proposition 7 is denied.

**B. Issues relating to jury selection at the re-sentencing trial.**

 ¶ 47 Appellant advances three claims regarding the selection of the jury for his re-sentencing trial. In Proposition 8, he claims he was denied a fair trial when the court denied his timely request to use juror questionnaires and/or individual *voir dire*. The

issue was fully preserved by a timely request, and we review the trial court's decision for an abuse of discretion. *Young v. State*, 2000 OK CR 17, ¶ 19, 12 P.3d 20, 31–32. Appellant offers no authority requiring questionnaires or individual *voir dire* in this situation or any other, and he offers no compelling reasons why either might have been preferable in this case.[14] Appellant offers no specific example of how he was unable to gather sufficient information to help him uncover bias and determine the relative "acceptability" of each panelist. The trial court did not abuse its discretion in denying Appellant's request for either juror questionnaires or individual *voir dire*. *Postelle v. State*, 2011 OK CR 30, ¶¶ 44–46, 267 P.3d 114, 134–35; *Cuesta–Rodriguez v. State*, 2010 OK CR 23, ¶¶ 57–58, 241 P.3d 214, 233. Proposition 8 is denied.

 ¶ 48 In Proposition 9, Appellant claims the trial court erred in excusing four prospective jurors who had expressed their inability to consider the death penalty as a possible punishment option under any circumstance. Appellant claims the court erred by excusing these panelists without instructing them on the definition of "mitigating circumstances," found in Instruction No. 1–5 (Alternate 2), OUJI–CR (2nd). He also claims the court violated 22 O.S.2001, § 665, by not allowing him an opportunity to "rehabilitate" the panelists on the capital-punishment issue.[15]

¶ 49 In the very early stages of jury selection, the court explained that this was a capital case, and that to be a qualified juror, a panelist must be willing to consider all punishment options provided by law. The court asked panelists to raise their hand if, regardless of the law and evidence presented

---

13. Besides the fact that a claim of low intellectual functioning will typically involve observations and data reaching back to the defendant's childhood (teachers, counselors, fellow students, test scores, *etc.*), we also note that Appellant was charged some twenty years ago, and has been in custody ever since. Appellant's ability to cope with the "real world"—his life before the crimes—was certainly relevant, and his incarceration has limited the number of "real world" situations he could have in the past two decades.

14. On the one hand, Appellant complains that the conditions in the courtroom were crowded and must have been uncomfortable; on the other hand, he admits that juror questionnaires or individual *voir dire* would only have lengthened the process.

15. Section 665 provides: "Upon the trial of a challenge to an individual juror, the juror challenged may be examined as a witness to prove or disprove the challenge, and is bound to answer every question pertinent to the inquiry therein."

to them, they were either irrevocably committed to the death penalty to the exclusion of other options, or unable to consider the death penalty at all. The first three panelists in question here—whom we will identify as Panelists 1, 2, and 3—raised their hands. As the court inquired, each of them, in turn, unequivocally expressed inability to consider the death penalty under any circumstance.

¶ 50 These panelists' positions were apparently so clear that defense counsel saw no reason to doubt or challenge them. Counsel's only objection to their removal was that the jury would not reflect a "fair cross-section of the community" without them.[16] Defense counsel had no other complaint about the removal of Panelist 1, although afterwards counsel asked if, in the future, she could conduct additional *voir dire* before dismissal. Panelists 2 and 3 also raised their hands and told the court they were unable to consider the death penalty under any circumstance. After careful questioning by the court, each was excused. As to Panelist 2, defense counsel's only objection, again, related to the "fair cross-section of the community." When the State moved to excuse Panelist 3, defense counsel objected but gave no grounds therefor.

¶ 51 With no substantive basis for challenging the positions of these panelists, Appellant claims only that the trial court erred by not reciting, verbatim, the language of Instruction No. 1–5 (Alternate 2), OUJI–CR (2nd) when explaining the mechanics of the capital-sentencing process. That instruction briefly introduces the panelists to the concepts of aggravating and mitigating factors which can affect whether a death sentence is warranted, or even available. Defense counsel did raise an objection about the court's failure to read directly from the Uniform Jury Instructions, but the objection was not

made until long after Panelists 1, 2, and 3 had been excused. Thus, our review here is only for plain error. *Postelle*, 2011 OK CR 30, ¶ 54, 267 P.3d at 137.

 ¶ 52 We review a trial court's management of *voir dire* for an abuse of discretion. *Grant*, 2009 OK CR 11, ¶ 21, 205 P.3d at 12. Certainly, capital cases require special inquiry into panelists' abilities to consider the death penalty (and, equally, to consider punishments other than the death penalty). But we decline to impose a rigid formula for trial judges to follow in capital jury selection. *Cf. Simpson v. State*, 2010 OK CR 6, ¶ 40 & n. 8, 230 P.3d 888, 902 & n. 8 (where this Court approved of certain language in Instruction No. 1–5, OUJI–CR (2nd), and encouraged trial courts to use it, but did not find reversible error in a trial court's failure to do so). Due process affords a capital defendant an opportunity to learn whether a prospective juror would automatically impose the death penalty. *Morgan v. Illinois*, 504 U.S. 719, 735–36, 112 S.Ct. 2222, 2223, 119 L.Ed.2d 492 (1992). There is no specific litany required to achieve this goal. The trial court may conduct the inquiry, or may allow counsel to do so. *See Sanchez v. State*, 2009 OK CR 31, ¶¶ 38–39, 223 P.3d 980, 995 (where the court used a "variation" of Instruction No. 1–5).

 ¶ 53 The trial court's introductory remarks on the subject of capital punishment—before asking for responses from the panelists—take up five pages of transcript. The court thoroughly explained the need for jurors who could follow the law and consider all available punishment options. The court also briefly explained the concepts of aggravating circumstances and mitigating circumstances. The court's explanation was no less acceptable because it did not follow Instruc-

---

**16.** This argument is based on a distortion of the idea that a defendant is constitutionally entitled to be tried by a jury representing a "fair cross-section of the community." *See e.g. Taylor v. Louisiana*, 419 U.S. 522, 527, 95 S.Ct. 692, 696, 42 L.Ed.2d 690 (1975) (systematic exclusion of women from jury service violated Sixth Amendment right to a fair trial), *citing Smith v. Texas*, 311 U.S. 128, 130, 61 S.Ct. 164, 165, 85 L.Ed. 84 (1940) (systematic exclusion based on race held unconstitutional) ("It is part of the established

tradition in the use of juries as instruments of public justice that the jury be a body truly representative of the community"). While the "fair cross-section" requirement means that states may not categorically exclude citizens from jury service on the basis of, say, race or gender, that certainly does not mean that states must include citizens who harbor actual or implied bias—such as an inability to follow the law. *See generally Coddington v. State*, 2011 OK CR 17, ¶ 4, 254 P.3d 684, 693–94.

tion No. 1–5 word-for-word. *Childress v. State*, 2000 OK CR 10, ¶ 45, 1 P.3d 1006, 1017. Even after the panelists in question volunteered their positions by raising their hands and responding to initial inquiries, the court went further—asking each panelist, individually, a series of precise questions.[17] As the trial court commented, additional questioning at that point would only have confused the panelists. A panelist who cannot follow the law, and at least give fair consideration to all punishment options, is excusable for cause. *Postelle*, 2011 OK CR 30, ¶¶ 48–49, 267 P.3d at 135. We find no error here, plain or otherwise.

¶ 54 We turn next to Panelist 4, who was not excused until the second day of *voir dire*. When the trial court began *voir dire* the day before with a discussion of opinions on the death penalty, Panelist 4 did not volunteer any committed opinion. The prosecutor subsequently asked panelists about any religious affiliations, and asked them to relate, in general terms, how their views on the death penalty had evolved over their lives. Panelist 4, a deacon in the Methodist church, volunteered that at the beginning of jury selection, he believed he could consider all three punishments; but after thinking about it further during the *voir dire* process, he had changed his mind. However, Panelist 4 agreed to remain as the prosecutor finished her discussion. It was not until the second day of *voir dire* that Panelist 4—having had additional time for reflection—told the court that he was unable to impose the death penalty under any circumstance. The court asked him the same questions posed to Panelists 1, 2 and 3. Only with regard to Panelist 4 did defense counsel specifically ask for an opportunity to pose additional questions of her own. We have held that it is not error to deny defense counsel an opportunity to rehabilitate a panelist who has clearly expressed an inability to consider a sentence of death under any circumstance. *See e.g. Postelle*, 2011 OK CR 30, ¶¶ 50–51, 267 P.3d at 135–36. Our review of the record shows that to be the situation here.

¶ 55 The trial court's excusal of these four panelists, for their expressed inability to follow the law on capital punishment, is clearly supported by the record. The court's *voir dire* on this subject was thorough, conscientious, and entirely acceptable. There was no error here, and Proposition 9 is denied.

¶ 56 In Proposition 10, Appellant claims that excusing prospective jurors due to their categorical inability to impose a sentence of death, as was done here, violates Oklahoma statute. As he observes, 22 O.S. 2001, § 660(8) specifically allows disqualification of a prospective juror whose views on the death penalty prevent her from finding the defendant guilty; but no provision specifically authorizes removal of a panelist when those views impair her ability to consider all available options in a capital sentencing proceeding.[18] We have considered this argument many times before and consistently rejected it. *See Postelle*, 2011 OK CR 30, ¶ 53, 267 P.3d at 136–37, and cases cited therein. A panelist's inability to consider the death penalty, and a panelist's inability to consider *anything but* the death penalty, equally disqualify her from service in a capital sentencing proceeding on the grounds of "actual bias".[19] *See* 22 O.S.2001, § 659(2)

---

17. The court's final questions to each panelist generally followed this format: (1) "Despite what the evidence might be in this case, or what the law is that I would provide you, you would never be able to vote for imposition of the death penalty?" (2) "Are you willing to give meaningful consideration to all of the possible alternative penalties provided for by law, and not be irrevocably committed to a position before the trial begins?" (3) "Are you unequivocal in your answer?" (4) "Are you firm in your convictions?" The court employed the same format before excusing another panelist who said he would automatically vote *for* the death penalty if the defendant was guilty of first-degree murder.

18. "A challenge for implied bias may be taken for all or any of the following cases, and for no other:

... If the offense charged be punishable with death, the entertaining of such conscientious opinions as would preclude his finding the defendant guilty of, in which case he shall neither be permitted nor compelled to serve as a juror.

22 O.S.2001, § 660(8)

19. As the State observes, if we were to read § 660(8) as the *only* circumstance where a panelist's views on the death penalty can disqualify her from service, defendants would suffer just as much as the State would. Because the section

(authorizing disqualification for "the existence of a state of mind on the part of the juror, in reference to the case, or to either party, which satisfies the court, in the exercise of a sound discretion, that he cannot try the issue impartially, without prejudice to the substantial rights of the party challenging"). Proposition 10 is denied.

## C. Issues relating to evidence in aggravation of punishment.

¶ 57 Appellant raises five claims relating to the law and evidence presented in support of the aggravating circumstances. As previously noted, the jury found three aggravating circumstances supporting the death penalty as to all five murders: (1) that Appellant had previously been convicted of a felony involving the use or threat of violence to the person (the "prior violent felony" aggravator); (2) that he knowingly created a great risk of death to more than one person (the "great risk of death" aggravator); and (3) that the murder was especially heinous, atrocious, or cruel. With regard to the murders of Shameka and Kenisha Carter only (Counts 2 and 5), the jury also found a fourth aggravating circumstance—that the murder was committed for the purpose of avoiding or preventing lawful arrest or prosecution. Even though it found several circumstances which could support the death penalty as to all counts, the jury only recommended the death penalty on these latter two counts.

¶ 58 In Proposition 11, Appellant claims the evidence simply does not support the jury's finding that he killed Shameka and Kenisha Carter in order to avoid arrest or prosecution. The State's theory was that Appellant felt compelled to kill Jennifer Smith's four children because they were potential witnesses to her murder. While Appellant clearly did other things to avoid detection (hiding all the bodies, cleaning the crime scene, lying to Smith's relatives about her whereabouts), our focus here is on whether the evidence reasonably shows that

his motive for killing the two girls was to avoid being revealed as the murderer of Jennifer Smith.[20]

¶ 59 Appellant points out that he never actually told police that he killed the girls (or any of the children for that matter) because they had witnessed him murder their mother; and he claims the rest of the evidence simply does not support such an inference. We disagree. Appellant told police that he attacked Jennifer Smith first. When Smith's two boys tried to intervene, Appellant attacked them too. The two girls, Shameka and Kenisha, were also in the house at the time. Appellant admitted to suffocating the girls after murdering Smith and her two sons. Viewing the evidence and all reasonable inferences in a light most favorable to the State, see *Postelle*, 2011 OK CR 30, ¶ 78, 267 P.3d at 143, we believe this sequence of events reasonably supports a conclusion that Appellant murdered the children because they had witnessed him murder their mother. The evidence was sufficient to support this aggravating circumstance. Proposition 11 is denied.

¶ 60 In Proposition 12, Appellant claims he was deprived of due process when the State failed to give him explicit notice that it intended to support the "murder to avoid arrest" aggravator with evidence that Appellant hid the bodies and cleaned the crime scene. Appellant did not raise this objection below, so we review the claim only for plain error. *Coddington v. State*, 2011 OK CR 17, ¶ 42, 254 P.3d 684, 704. While the State is required to give a capital defendant notice of the aggravating circumstances it alleges in seeking the death penalty, see 21 O.S.2001, § 701.10(C) it is not required to specifically identify every piece of evidence it will use to support them. Appellant was first tried for this crime in 1994, and the State gave written notice that it would use all evidence from that trial to support the "murder to avoid arrest" aggravator. We have found similar references to prior proceedings

---

says nothing about a panelist's views *with regard to punishment,* it does not permit disqualification when a panelist avers that she would automatically vote *for* a death sentence if the defendant is convicted of First Degree Murder.

**20.** The jury's verdicts do not tell us why it did not find the "murder to avoid arrest" aggravator with respect to the murders of the two boys. *See* discussion of Proposition 15 below.

to be sufficient notice. *Coddington,* 2011 OK CR 17 at ¶¶ 43–44, 254 P.3d at 704–05. Furthermore, before Appellant's first trial, the State gave specific written notice that it would use this same evidence for precisely the same purpose. Appellant never claimed to be surprised by how this evidence was used in this trial, and we find no error, plain or otherwise. *Id.* at ¶ 45, 254 P.3d at 705. Proposition 12 is denied.

¶ 61 In Proposition 13, Appellant claims the "heinous, atrocious, or cruel" aggravating circumstance is unconstitutionally overbroad. Specifically, while this aggravator requires a finding that the victim experienced either conscious physical suffering or extreme mental cruelty before death, Appellant claims that the defendant's intention to inflict such pain and suffering is an essential prerequisite. We have rejected this claim many times. *See Cuesta–Rodriguez,* 2010 OK CR 23, ¶ 80, 241 P.3d at 238, and cases cited therein. We decline to revisit this contention.[21] Proposition 13 is denied.

 ¶ 62 In Proposition 14, Appellant contends that certain evidence presented in the re-sentencing trial was unfairly prejudicial to him. Appellant violently attacked another woman, Alethia Bonner, with a knife in 1986. He was convicted and sentenced for that crime. Bonner testified about the details surrounding this violent attack, and the State introduced documents concerning the conviction. Among the several aggravating circumstances alleged by the State were (1) that Appellant had been convicted of a crime of violence, and (2) that he was a continuing threat to society. As to all five murder counts, the jury found the "prior violent felony" aggravator, but it rejected the "continuing threat" claim. Appellant argues that Bonner's testimony about the 1986 attack was not necessary to support the claim that he had previously been convicted of a violent

felony. *See Brewer v. State,* 1982 OK CR 128, ¶¶ 40–42, 650 P.2d 54, 63 (recognizing that the State's obligation to prove the "violent" nature of the prior felony can be prejudicial to the defendant, we held that when the State alleges the "prior violent felony" aggravating circumstance, the defendant must be given an opportunity to stipulate to the necessary elements). This may be true, but Appellant overlooks the fact that the details of the attack were presented for a different and entirely legitimate purpose: to support the "continuing threat" aggravator.[22] We have addressed this situation many times before. *See e.g. Smith v. State,* 1991 OK CR 100, ¶¶ 28–33, 819 P.2d 270, 277–78. There was no error here. Proposition 14 is denied.

 ¶ 63 In Proposition 15, Appellant claims that Oklahoma's capital sentencing scheme is unconstitutional because it fails to adequately channel the sentencer's discretion. He acknowledges that we do not conduct a proportionality review (a comparison of circumstances among capital cases to determine if a death sentence is "appropriate" in this one). *See Patton v. State,* 1998 OK CR 66, ¶ 120, 973 P.2d 270, 301. Nevertheless, he claims a particular fact in his case illustrates the capriciousness of Oklahoma's capital sentencing scheme. Appellant points out that the jury only found the "murder to avoid arrest" aggravator with regard to Smith's two daughters (Counts 2 and 5), even though the aggravator was also alleged as to Smith's two sons (Counts 3 and 4). Appellant argues that if the evidence supported this aggravator at all, it logically applied to Counts 3 and 4 as well. This discrepancy, he believes, is evidence that the jury's discretion was not properly channeled. We disagree.

 ¶ 64 The concept of fact-finder discretion is important here. First, we note

---

21. Appellant attempts to add a new twist to the argument by taking language from *Coddington v. State* out of context. *See Coddington,* 2011 OK CR 17, ¶ 61, 254 P.3d at 709 ("[I]t is not necessary to narrow a factfinder's discretion when considering this aggravating circumstance"). Contrary to Appellant's claim, *Coddington* does not purport to remove the requirement of either "serious physical abuse" or "extreme mental cruelty" from this aggravator. Read in context,

the passage simply explains that the aggravator's applicability is not *"further* narrowed" only to cases where the defendant specifically intended such pain or suffering.

22. That the jury ultimately rejected the "continuing threat" aggravator is, of course, irrelevant to whether the evidence was permissible for that purpose.

that Oklahoma's capital sentencing procedure is constructed so that no matter how many aggravators are incontrovertibly proven, no matter how paltry the mitigating evidence might be, the sentencer is never—under any circumstance—*required* to impose a sentence of death. Furthermore, inconsistencies in verdicts (which in a capital case include special findings about aggravating circumstances) are not, by themselves, evidence of error. In a prosecution for multiple counts, the validity of one verdict is not determined by consistency among all; rather, a verdict is proper if it is supported by substantial evidence. *Dunn v. United States,* 284 U.S. 390, 393, 52 S.Ct. 189, 190, 76 L.Ed. 356 (1932); *Gray v. State,* 1982 OK CR 137, ¶ 20, 650 P.2d 880, 884. Except for the requirement that at least one aggravating circumstance must be unanimously declared by the jury before a death sentence can even be considered, *see* 21 O.S.2001 § 701.11 capital juries are not required to explain their decision-making process. The jury's verdicts in this case do not signal a structural failure in Oklahoma's capital sentencing scheme. Proposition 15 is denied.

**D. Miscellaneous challenges to Oklahoma's capital sentencing scheme.**

¶ 65 In Proposition 16, Appellant summarily attempts to preserve nine issues that, as he acknowledges, have been consistently rejected by this Court.

*1. Consideration of mitigating evidence is, in tact, required.*

¶ 66 Appellant claims that Oklahoma's Uniform Jury Instructions do not require the jury to consider any evidence in mitigation of sentence. This argument takes certain language out of context (the word "may" in the definition of "mitigating evidence," found in Instruction No. 4–78, OUJI–CR (2nd)) and ignores the plain meaning and mechanics of the instructions as a whole. We have rejected this argument several times before. *See Postelle,* 2011 OK CR 30, ¶ 86, 267 P.3d at 144–45; *Harmon,* 2011 OK CR 6, ¶ 85, 248 P.3d at 944–45. This claim is denied.

*2. A death sentence is not presumed after aggravating circumstances are found.*

¶ 67 Appellant unreasonably interprets Instruction No. 4–76, OUJI–CR (2nd) to argue that the jury was led to believe that a sentence less than death was not appropriate if any aggravating circumstances were found to exist. We have rejected this argument before, *see e.g. Harmon,* 2011 OK CR 6, ¶ 86, 248 P.3d at 945, and do so again. What is more, in this particular case, it is clear that the jury understood it could impose a sentence less than death even after finding the existence of aggravating circumstances; the jury did just that with regard to Counts 1, 3, and 4. This claim is denied.

*3. Unspecified challenges to the capital sentencing scheme are waived.*

¶ 68 Appellant attempts to incorporate, by reference, a number of arguments he made to the trial court about the constitutionality of Oklahoma's death-penalty procedure. Because he does not specify the arguments or cite any authority to support them, we decline to consider them further. Rule 3.5(A)(5), *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch. 18, App. (2013); *Harmon,* 2011 OK CR 6, ¶ 87, 248 P.3d at 945.

*4. Special verdicts in capital cases do not violate Okla. Const. Art. 7, § 15.*

¶ 69 Appellant claims (as he did below) that the special findings made by juries in capital cases (regarding the existence of aggravating circumstances) violate Article 7, § 15 of the Oklahoma Constitution. We have rejected this argument many times, and do so again. *Harmon,* 2011 OK CR 6, ¶ 88, 248 P.3d at 945.

*5. There is no right to allocution or for the defense to argue last.*

¶ 70 Appellant claims he should have been allowed to make the final closing argument to the jury, and/or to allocute (make a personal plea for mercy) to the jury. Appellant unsuccessfully raised this claim below, and he acknowledges that we have rejected it in the past. *Duckett v. State,* 1995 OK CR 61,

¶¶ 54–60, 919 P.2d 7, 20–22. We decline to revisit it at this time.

### 6. *Oklahomas lethal-injection scheme is not unconstitutional.*

¶ 71 Appellant argues, as he did below, that Oklahoma's execution of the death sentence by lethal injection involves a "substantial risk" of harm, which could result in cruel or unusual punishment, violating the Eighth Amendment to the United States Constitution, or Article 2, § 9 of the Oklahoma Constitution.[23] Appellant concedes that the chemicals used and the dosages employed are fixed by law, but he complains that Oklahoma's procedure (1) shields the identities of those administering the drugs; (2) leaves certain decisions surrounding administration of the drugs up to the individuals administering them; and (3) provides no "backup plan" should a doctor be unavailable to assist in the execution. We have rejected these claims before, *see Harmon*, 2011 OK CR 6, ¶¶ 91–92, 248 P.3d at 946 (and cases cited therein), and do so again.

### 7. *Victim impact evidence is not a "super-aggravator."*

¶ 72 At trial, Appellant unsuccessfully claimed that victim impact evidence, as defined in 22 O.S.2001, §§ 984, 984.1, derails the capital sentencing scheme by acting as a "super-aggravator," overriding any fair evaluation of aggravating and mitigating circumstances. This argument has been considered and rejected many times. *See e.g. Harmon*, 2011 OK CR 6, ¶ 93, 248 P.3d at 946. We see no reason to re-consider it.

### 8. *Instructions on victim impact evidence were not unconstitutional.*

¶ 73 Appellant claims that the instructions failed to properly channel the jury's consideration of victim impact evidence. He observes that while Oklahoma law authorizes the jury to consider the victim's death as a loss to the immediate family, *see* 22 O.S.2001, § 984, Uniform Jury Instruction No. 9–45 (which was used in this case) allows the jury to consider the victim's death as a loss to society at large. We have considered and rejected this claim before, and do so again. *Cuesta–Rodriguez*, 2010 OK CR 23, ¶¶ 72–74, 241 P.3d at 237.

### 9. *Appellants intellectual functioning was fully and fairly litigated.*

¶ 74 Appellant asks this Court to reconsider its prior rulings concerning his claim of mental retardation. Appellant fully litigated this issue with regard to whether the State could even seek the death penalty against him after *Atkins v. Virginia.* We afforded Appellant a jury trial on the issue; we gave full review to that proceeding and found no reversible error. Appellant was allowed to present the same type of evidence at a competency trial, and we have found no reversible error therein. See Propositions 1 and 2, above. Finally, Appellant presented evidence of his impaired abilities to a *third* jury in hopes of avoiding the death penalty, and we have found no reversible error there, either. Appellant offers no cogent reason for granting relief here.[24]

## CUMULATIVE ERROR

¶ 75 In Proposition 17, Appellant claims that trial errors, when considered cumulatively, warrant either remand or modification. We have found no error committed by the trial court. Although admittedly irrelevant information was related by a witness (see Proposition 5), we found no justification for reversal. There are no other errors to accumulate, and Proposition 17 is denied. *Harmon*, 2011 OK CR 6, ¶ 95, 248 P.3d at 946–47.

---

**23.** Appellant invokes these constitutional provisions separately, contending that Oklahoma's ban on "cruel *or* unusual" punishment provides more protection than the federal constitution's ban on "cruel *and* unusual" punishment. We find Oklahoma's lethal-injection scheme acceptable by either measure.

**24.** At the re-sentencing trial, the court gave the defense somewhat more leeway on the issue of mental retardation than it had at the competency trial. The court wisely and judiciously allowed defense counsel to explicitly argue that Appellant was "mentally retarded" as a mitigating circumstance. The State was *not* allowed to rebut that claim with the 2004 *Atkins* verdict.

## MANDATORY SENTENCE REVIEW

¶ 76 Under 21 O.S.2011, § 701.13, this Court is required to determine whether the sentence of death was imposed "under the influence of passion, prejudice or any other arbitrary factor," and whether the evidence supports the aggravating circumstances identified by the finder of fact. In Proposition 18, Appellant asks this Court to modify his death sentences pursuant to our mandatory sentence review. After a review of the record, we find that the death sentences were not influenced by any trial error, misconduct, passion or prejudice. The four aggravating circumstances that the jury identified as to Counts 2 and 5—the only counts on which a death sentence was imposed—are supported by the evidence. The jury's conclusion that these aggravating circumstances outweighed the evidence presented in mitigation is also supported by the record. We find no reason to disturb any of the sentences imposed.

## DECISION

¶ 77 The Judgment and Sentence of the district court is **AFFIRMED**. Pursuant to Rule 3.15, *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch.18, App. (2013), the **MANDATE** is **ORDERED** issued upon the delivery and filing of this decision.

LEWIS, P.J., SMITH, V.P.J., and A. JOHNSON, J.: concur.

LUMPKIN, J. concur in results.

LUMPKIN, Judge: concur in results.

¶ 1 I concur in the affirmance of the judgment and sentence in this case. I write separately though to address certain issues.

¶ 2 In Proposition I, I concur in the finding that whether Appellant is "mentally retarded" has been decided but I disagree with the Court's reliance on the Law of the Case doctrine as supporting authority. The principles of *res judicata* and collateral estoppel govern criminal cases and we should not be venturing into civil law by adopting the Law of the Case doctrine, a judicially created doctrine used primarily in civil cases as an estoppel to relitigation of a fact determined as against the same parties. In criminal cases, defendants must be treated equally and consistently. The Law of the Case Doctrine is a more subjective test and its use gives the impression that some different standard applies. It is extremely important in the review of criminal cases that the Court be consistent and apply the law equally. The principles of *res judicata* and collateral estoppel sufficiently support the trial court's ruling.

¶ 3 In Proposition II, I agree with the interpretation of 22 O.S.2001, § 1175.5. I would even go a step further and recommend that the committee on the Oklahoma Uniform Jury Instruction–Criminal amend the uniform instructions to reflect this bifurcated procedure. This would ensure that future cases would be consistent in interpreting § 1175.5 as a bifurcated process.

¶ 4 In Proposition 3, I would add that statutes, not courts, create rights of appeal and there is no constitutional right to appeal.